# Supreme Court of Florida

_____

No. SC12-2314
_____

**RUBY SAUNDERS, etc., et al.**,
Petitioners,

vs.

**WILLIS DICKENS, M.D.**,
Respondent.

[July 10, 2014]

LEWIS, J.

Ruby Saunders, individually and as Personal Representative of the Estate of

Walter Saunders,[1] seeks review of the decision of the Fourth District Court of

Appeal in Saunders v. Dickens, 103 So. 3d 871 (Fla. 4th DCA 2012), on the basis

that it expressly and directly conflicts with the decision of the Fifth District Court

of Appeal in Goolsby v. Qazi, 847 So. 2d 1001 (Fla. 5th DCA 2003), and the

decision of the Third District Court of Appeal in Muñoz v. South Miami Hospital,

_____

1. Because Saunders passed away during the pendency of the appeal, his
estate was substituted as a party.

Inc., 764 So. 2d 854 (Fla. 3d DCA 2000).  We have jurisdiction.  See art. V, §

3(b)(3), Fla. Const.

## FACTS

Walter Saunders met with Dr. Willis Dickens, M.D., a neurologist, on July

7, 2003, because he was experiencing back pain, leg pain, and unsteadiness on his

feet.  Saunders also informed Dr. Dickens that he was experiencing cramps in his

hands and feet, numbness in his hands, and tingling in his feet.  The physical

examination revealed weakness in Saunders's finger extensors.  Dr. Dickens

concluded that because Saunders displayed normal reflexes, the numbness and

tingling in Saunders's hands was caused by peripheral neuropathy due to diabetes.

However, he did not perform a test to confirm diabetic neuropathy.  After the

physical examination, Dr. Dickens recommended that Saunders be admitted to the

hospital.  When Saunders arrived at the hospital, Dr. Dickens ordered an MRI of

Saunders's brain and lumbar spine.  The MRI results for the brain were normal;

however, the MRI of the lumbar spine demonstrated severe stenosis (narrowing) of

the spinal canal.

After he received the lumbar spine MRI results, Dr. Dickens asked Dr.

Guillermo Pasarin, a neurosurgeon, for a consultation.  Dr. Pasarin testified during

depositions that on July 10, 2003, he performed a complete neurological

examination of Saunders.  Saunders did not inform him of any upper extremity

- 2 -

problems, and Dr. Pasarin did not observe any upper extremity abnormalities or read the notation written by Dr. Dickens with respect to Saunders's symptoms in his hands. Dr. Pasarin reviewed the MRI results, ordered additional radiological diagnostic studies of Saunders's lumbar spine, and concluded that a lumbar decompression procedure was necessary. Dr. Pasarin performed the surgery on July 15, 2003.

After the surgery, Saunders's condition did not significantly improve. On September 11, 2003, Dr. Pasarin ordered cervical, thoracic, and lumbar MRIs, which revealed compression in both the lower back and neck. After he received the MRI films, Dr. Pasarin met with Saunders on October 3, 2003, at which point Saunders reported that the symptoms in his arms and hands had worsened since the surgery. Dr. Pasarin conducted a physical exam of Saunders, which revealed weakness in his upper extremities and abnormal reflexes in his arms. Dr. Pasarin recommended that cervical decompression surgery be performed within one month, but required that Saunders first obtain medical clearance for surgery. Although Saunders was cleared for surgery on November 6, 2003, Dr. Pasarin did not schedule the surgery in November, and Saunders developed a deep venous thrombosis in December that prevented him from undergoing surgery at that time.

In January 2004, another neurosurgeon met with Saunders. This neurosurgeon concluded that Saunders should undergo a second lumbar surgery

and, at a later date, a cervical spine surgery. The neurosurgeon performed the lumbar surgery, but the cervical spine surgery was never performed. Saunders's condition continued to degenerate until he progressed to quadriplegia. He passed away during the pendency of the appeal.

Saunders and his wife filed a failure to diagnose action which included a loss of consortium claim against Dr. Pasarin; Broward Neurosurgeons, LLC; and Broward General Medical Center. They later amended the complaint to include Dr. Dickens as a defendant in the action. All defendants except Dr. Dickens settled with the Saunders. The action against Dr. Dickens proceeded to trial, and Dr. Dickens raised as an affirmative defense that Dr. Pasarin's negligence was the cause of Saunders's injury. Dr. Pasarin was included on the verdict form as a Fabre[2] defendant.

During trial, the Saunders presented the expert testimony of a neurologist, who testified that Dr. Dickens had breached the standard of care for a neurologist. He testified that the upper body symptoms displayed by Saunders would lead a reasonable physician to believe that a problem in the neck or brain existed.

---

2. Fabre v. Marin, 623 So. 2d 1182 (Fla. 1993); see also § 768.81(3), Fla. Stat. (2013). In Fabre, this Court held that liability must be apportioned among responsible parties on the basis of fault, regardless of whether each party was joined in the action. 623 So. 2d at 1185. A Fabre defendant is one who is not a party to the lawsuit, but is alleged to be wholly or partially at fault and is placed on the verdict form so that the jury may apportion a percentage of fault to that person or entity. See Phillips v. Guarneri, 785 So. 2d 705, 706 n.1 (Fla. 4th DCA 2001).

- 4 -

Further, he testified that after an MRI had clearly demonstrated that the brain was not the cause of the upper body symptoms, the neck would be the next area that a reasonable and prudent physician should and would evaluate. The neurologist also testified that although peripheral neuropathy due to diabetes could have caused some of Saunders's upper body symptoms, Dr. Dickens breached the standard of care when he failed to consider other potential causes, such as a cervical cord compression. The neurologist opined it was more likely than not that Saunders's condition would have stayed the same or improved had he been diagnosed with a cervical cord compression in July 2003. However, the expert also stated that a neurologist would defer to a neurosurgeon with regard to whether and when to operate and how to execute the procedure.

The Saunders also presented the testimony of an orthopedic spinal surgeon who met with Mr. Saunders in 2006. At that point, Saunders was a quadriplegic, which the orthopedic surgeon testified was due to a cervical spine injury. The orthopedic surgeon testified that a lumbar cord compression would not cause symptoms in a person's hand, but rather, such symptoms would be caused by an issue in the cervical spine or brain. However, he acknowledged that the findings of Dr. Pasarin could also be associated with lumbar stenosis. It was his opinion that had surgery been performed on the cervical cord compression in July 2003, Saunders more likely than not would <u>not</u> have progressed to quadriplegia.

Dr. Dickens presented a neurosurgeon as an expert witness, who testified that based on the July 2003 MRI, as well as the notes and findings of both Dr. Dickens and Dr. Pasarin, it was within a reasonable standard of care for Dr. Pasarin to operate on Saunders's lumbar spine in July 2003. He explained that the numbness and tingling in Saunders's hands could have been attributed to something other than a neck problem, but the pain, weakness, and difficulty walking were undoubtedly the result of a lumbar spine problem. Further, he testified that because the primary complaint related directly to Saunders's legs, there was no reason to suspect a cause other than a lower back problem. He also explained that the major symptoms experienced by Saunders could not have been caused by a cervical cord compression, and a decision on whether to perform surgery on the neck would have been reached after surgery on the lower back. It was his opinion that Dr. Pasarin deviated from a reasonable standard of care because he failed to perform a complete lumbar decompression in July 2003. This failure caused additional injury to Saunders, who was required to undergo a second lumbar surgery in January 2004.

Dr. Dickens also presented a neurologist, who testified that it was within a reasonable standard of care for Dr. Dickens to focus on Saunders's lumbar spine in July 2003. He explained that a complaint of pain and weakness in the back, without any reference to neck pain or a demonstration of hyper reflexes during the

physical examination, signified that the lumbar back, rather than the neck, was the cause of the symptoms. He also testified that tingling in the hands and feet is a common symptom of diabetic neuropathy. However, he acknowledged that, had a cervical MRI been performed in July, it likely would have demonstrated the cervical compression that was discovered in September.

Dr. Dickens also introduced the depositions of Dr. Pasarin, which had been taken prior to the settlement between Dr. Pasarin and the Saunders. In the depositions, Dr. Pasarin stated that even if he possessed the results of a cervical MRI in July, he would not have operated on the neck because Saunders had not yet experienced problems with his upper extremities.

At the close of the evidence, Dr. Dickens moved for a directed verdict. He contended that the depositions of Dr. Pasarin rendered it impossible for the Saunders to establish that Mr. Saunders's injury was caused by any negligence of Dr. Dickens. The trial court determined that causation was an issue for the jury to decide and denied the motion for a directed verdict. During closing statements, counsel for the Saunders asserted that Mr. Saunders would not have progressed to quadriplegia had Dr. Dickens recognized in July 2003 that Mr. Saunders's upper body symptoms were the result of a cervical problem. Counsel stated:

> The purpose of this case, our experts talked about what reasonable and prudent physicians would have done under the circumstances. That is what you, as jurors need to consider when evaluating the liability of Dr. Dickens. You need to assume that had

he ordered the right test and a cervical spine showed what everybody said it would have shown, that it would have been the same at that point.

That the surgeon would have acted in a reasonable, prudent manner. Not in a negligent manner, like Dr. Pasarin did. Not like Dr. Pasarin said he would have done. . . . Dr. Pasarin's negligence in no way excuses Dr. Dickens'[s] negligence.

Subsequently, counsel for Dr. Dickens contended during closing statements that the Saunders had not established causation. Specifically, counsel stated "[b]ut for Dr. Dickens not doing the MRI, the neck MRI, Dr. Pasarin would have operated on Mr. Saunders'[s] neck in July. That is what the plaintiffs['] claim must be and it hasn't remotely come close." Counsel for the Saunders objected on the basis that this was a misstatement of the law. The trial court overruled the objection, but reminded the jury that it was required to follow the law as provided in the jury instructions. Counsel for Dr. Dickens then discussed the effect of Dr. Pasarin's testimony on the element of causation. He stated:

Dr. Pasarin testified had I been given the information by the patient, I would have ordered the film. Had Dr. Dickens ordered the film, I wouldn't have done anything different. That was his testimony. I would have operated on the low back.

So how is it that it can be said that had Dr. Dickens ordered the cervical spine MRI, surgery would have been done on the cervical spine if Dr. Pasarin, the doctor who was there, who was the neurosurgeon said "I wouldn't have done it. I wouldn't have done it?"

. . . .

Which then brings us again to this same question of but for Dr. Dickens ordering the cervical spine films there would have been surgery in July.

. . . .

Now, they want to suggest to you that somehow things would have been different if there had been someone other than Dr. Pasarin. I guess that's what they are going to suggest to you.

Well, Dr. Pasarin was the doctor there. It is sheer speculation about what anybody else might have done. And there isn't anybody else that was involved in this. There has been no testimony whatsoever, no testimony whatsoever that Dr. Dickens should have called in another neurosurgeon, none.

So how is it that there is any evidence at all to link the alleged negligence of Dr. Dickens in failing to call for the cervical spine MRI and Dr. Pasarin's not doing the surgery? There is no connection whatsoever.

Subsequently, counsel for the Saunders sought a curative instruction that a Fabre defense is an affirmative defense for which the defendant bears the sole burden of proof, and the Saunders were not required to prove that Dr. Pasarin was negligent. The trial court declined to provide such an instruction on the basis that the jury had already been instructed on the law.

The jury returned a general verdict in favor of Dr. Dickens. The Saunders appealed, and the Fourth District held that counsel for Dr. Dickens did not improperly shift the burden of proof when he asserted that the Saunders had not established causation in light of Dr. Pasarin's testimony that he would not have changed the course of treatment even if Dr. Dickens had ordered a cervical MRI. Saunders, 103 So. 3d at 877. The Fourth District relied on Ewing v. Sellinger, 758 So. 2d 1196, 1198 (Fla. 4th DCA 2000), in which it affirmed a directed verdict in favor of an obstetric defendant. See Saunders, 103 So. 3d at 878. The obstetrician in Ewing contended that because a subsequent treating physician would not have

altered the course of treatment had the obstetrician performed differently, the plaintiffs had failed to establish causation. Ewing, 758 So. 2d at 1198. Thus, the Fourth District in the decision below held that pursuant to Ewing, the closing statement by counsel for Dr. Dickens was not improper.

However, the Fifth District in Goolsby and the Third District in Muñoz have rejected the reasoning in Ewing and held that the negligence of a physician cannot be defended on the basis of what a subsequent treating physician allegedly would have done had the first physician not acted negligently. Goolsby, 847 So. 2d at 1003; Muñoz, 764 So. 2d at 857. We accepted review based upon this conflict.[3]

## ANALYSIS

The issue presented in this case regards the burden of proof in negligence actions. This is a pure question of law, which this Court reviews de novo. D'Angelo v. Fitzmaurice, 863 So. 2d 311, 314 (Fla. 2003).

### **Ewing**

In Ewing, parents filed a medical malpractice action against obstetricians who provided prenatal care to the mother. 758 So. 2d at 1197. After the expectant mother passed her due date, one of the obstetricians recommended that labor be

---

3. We do not address the additional issues briefed in this case, which concern whether counsel for Dr. Dickens improperly shifted the burden of proof when he commented during closing statements that the Saunders failed to produce evidence with respect to the negligence of Dr. Pasarin, and whether the trial court erred when it failed to strike the pleadings of Dr. Dickens.

induced, which was done the next day.  Id.  During labor, a nurse requested the assistance of the on-call physician.  Id.  Due to the size of the child, the mother suffered permanent injury from the birth and the child was born cyanotic from lack of oxygen.  Id.  In the subsequent legal action, the parents contended that the obstetrician should have performed a risk assessment, which would have established that a physician should have been present during labor.  Id.  According to the parents, had the physician been present earlier, he would have performed a cesarean section, and any injury to the mother or the child would have been avoided.  Id.  However, the on-call physician testified that even if he had been present, he would not have performed a cesarean section earlier because the labor was adequately progressing.  Id. at 1198.  On this basis, the Fourth District held that the parents failed to establish that the failure of the obstetrician to perform a risk assessment was the legal cause of the injuries.  Id. at 1197-98.

## Conflict Cases

In Muñoz, the Third District held that testimony by the subsequent treating physician of how he would have proceeded had the prior physician acted differently was speculative and insufficient to support summary judgment in favor of the prior physician, and that the issue of causation was to be decided by the jury. 764 So. 2d at 857.  In Muñoz, the parents of a child filed a negligence action against, among others, the obstetrician-gynecologist (OBGYN) who treated the

pregnant mother and delivered the child, as well as the hospital where the child was born.  Id.  The OBGYN performed a sonogram on the pregnant mother, which revealed that one of the child's kidneys may not have been filtering properly.  Id.  On the advice of the family pediatrician, no action was taken.  Id.

When the baby was born, the OBGYN recorded the results of the sonogram in the chart, but did not personally inform the pediatrician of the results.  Id.  The pediatrician assumed care of the child after the delivery, determined that the kidney was fine, and discussed the matter with the mother and maternal grandmother.  Id.  While in the hospital, the child developed two symptoms that, when present together, suggested kidney dysfunction.  Id.  The hospital alerted the on-call pediatrician, but informed him of only one of the symptoms, which by itself did not suggest kidney dysfunction.  Id.  The physician ordered treatment of that symptom and the symptom disappeared.  Id. at 855.  It was later established that the child's kidneys were severely damaged.  Id. at 856.

During trial, the parents presented evidence that the kidney damage would have been preventable had the child been adequately examined and treated after birth.  Id.  The OBGYN and hospital contended that even if they were negligent, they were not the legal cause of the injuries because the parents and grandparents informed the pediatrician of the sonogram results, and the pediatrician testified that he would not have acted differently had the OBGYN or other hospital personnel

- 12 -

also informed him of the results.  Id.  The Third District held that the speculative testimony of the pediatrician was not determinative of legal causation and the defendants could not rely on the possibility that, had they acted within the applicable standard of care, the pediatrician would not have performed any differently.  Id. at 857.  The Third District explained that had the defendants conformed to the applicable standard of care, all doubt would be removed as to whether the pediatrician would have acted the same.  Id.

The Fifth District reached a similar conclusion in Goolsby, in which the parents of a child born with hip dysplasia filed a negligence action against the doctor who performed x-rays on the child after her birth.  847 So. 2d at 1002.  The nurses present at the birth observed hip clicks and notified the pediatrician.  Id.  The pediatrician ordered x-rays from both the defendant and an orthopedic surgeon, neither of whom diagnosed hip dysplasia.  Id.  The defendant, in reliance on Ewing, contended that no evidence was presented that the pediatrician would have changed her treatment of the child had she been informed that the x-rays demonstrated hip dysplasia and, therefore, there was no evidence that any negligence by him was the cause of any injury.  Id. at 1003.  However, the pediatrician never testified that she would have ignored a conclusion by the defendant that the x-rays demonstrated hip dysplasia.  Id.

- 13 -

The Fifth District disagreed with the decision in Ewing to the extent it held that the negligent failure to diagnose cannot be the cause of damages if a subsequent treating physician testifies that he or she would have disregarded a correct diagnosis. Id. Instead, the Fifth District held that the plaintiffs were not required to prove that the subsequent treating pediatrician would not have acted negligently had the defendant concluded that the x-rays demonstrated hip dysplasia. Id. at 1004.

**Medical Malpractice Actions**

The elements of a medical malpractice action are: (1) a duty by the physician, (2) a breach of that duty, and (3) causation. See Gooding v. University Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984) (citing Wale v. Barnes, 278 So. 2d 601, 603 (Fla. 1973)). The duty element requires a physician to act within the standard of professional care. See § 766.102, Fla. Stat. (2013). The standard of professional care is a level of care, skill, and treatment that, in consideration of all surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably prudent health care providers. Id. In short, it is to provide the care that a reasonably prudent physician would provide. See Pate v. Threlkel, 661 So. 2d 278, 280 (Fla. 1995). A physician breaches that duty when he or she does not provide the care that a reasonably prudent physician would provide. See § 766.102, Fla. Stat. (2013). Therefore, in a medical malpractice action, the

- 14 -

burden is on the plaintiff to establish that the care provided by the physician was not that of a <u>reasonably prudent physician</u>.

Medical malpractice actions often involve a battle of expert witnesses, and each party often presents testimony by experts with respect to what a reasonably prudent physician would have done and the effect that such reasonable care would have had on the patient. It is then the role of the jury to determine how a reasonably prudent physician would have acted. Because the central concern in medical malpractice actions is the reasonably prudent physician standard, the issue of whether a treating physician acted in a reasonably prudent manner must be determined for <u>each</u> individual physician who is a defendant in a medical malpractice action. A subsequent treating physician simply may not be present at the time a defendant physician makes an allegedly negligent decision or engages in a potentially negligent act. Further, it is not only the final physician, but rather each treating physician who must act in a reasonably prudent manner. We hold that a physician cannot insulate himself or herself from liability for negligence by presenting a subsequent treating physician who testifies that adequate care by the defendant physician would not have altered the subsequent care. To do so would alter the long-established reasonably prudent physician standard where the specific conduct of an individual doctor in a specific circumstance is evaluated. It would place a burden on the plaintiff to somehow prove causation by demonstrating that a

- 15 -

subsequent treating physician would not have disregarded the correct diagnosis or testing, contrary to his or her testimony and irrespective of the standard of care for the defendant physician. To require the plaintiff to establish a negative inappropriately adds a burden of proof that simply is not required under the negligence law of this State.

## This Case

In his closing statement, counsel for Dr. Dickens informed the jury that the Saunders had not established that Mr. Saunders's injuries were the result of any negligence on the part of Dr. Dickens. Counsel explained that because Dr. Pasarin would not have done anything differently had Dr. Dickens ordered a cervical MRI, any purported negligence by Dr. Dickens could not be the cause of Saunders's injuries. As discussed above, this was a misstatement of the law. The Saunders were required to establish only that Dr. Dickens's care fell below that of a reasonably prudent physician and that, more likely than not, adequate care by Dr. Dickens would have prevented Mr. Saunders's devastating injuries. See Gooding, 445 So. 2d at 1018 ("In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury."). As a result, the trial court erred when it permitted defense counsel to mislead the jury during closing statements.

Moreover, we conclude that this error was harmful. Defense counsel erroneously informed the jury that the Saunders had not proven causation based upon Dr. Pasarin's testimony. The deposition of Dr. Pasarin was taken while Dr. Pasarin was in an adversarial relationship with the Saunders. However, prior to trial, Dr. Pasarin entered into a settlement agreement with the Saunders and, as required by section 768.041(3), Florida Statutes (2003), the jury was not informed of the settlement. Because the Saunders were unable to address their prior adversarial relationship with Dr. Pasarin, the jury was unaware that Dr. Pasarin was motivated by a desire to deny wrongdoing and avoid liability. Further, counsel for Dr. Dickens repeatedly relied on this testimony in his improper burden-shifting statements. As a result, we conclude that the closing statement by counsel for Dr. Dickens misled the jury and resulted in harmful error.

## CONCLUSION

Based on the foregoing, we hold that testimony that a subsequent treating physician would not have treated the patient plaintiff differently had the defendant physician acted within the applicable standard of care is irrelevant and inadmissible and will not insulate a defendant physician from liability for his or her own negligence. Instead, the burden on the plaintiff with regard to causation is only to establish that adequate care by the physician more likely than not would have avoided the plaintiff's injury. Accordingly, we quash the decision below,

- 17 -

disapprove the decision in Ewing, and approve the decisions in Goolsby and

Muñoz.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
POLSTON, J., dissents with an opinion in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.


POLSTON, J., dissenting.

I respectfully dissent because I conclude that the Fourth District's decision

in Saunders v. Dickens, 103 So. 3d 871 (Fla. 4th DCA 2012), does not expressly

and directly conflict with the Third District's decision in Muñoz v. South Miami

Hospital, Inc., 764 So. 2d 854 (Fla. 3d DCA 2000), or the Fifth District's decision

in Goolsby v. Qazi, 847 So. 2d 1001 (Fla. 5th DCA 2003). Therefore, there is no

basis for this Court to exercise jurisdiction.

In Muñoz, 764 So. 2d at 855-56, the plaintiffs sued, among others, the

obstetrician-gynecologist (OBGYN), who treated the expectant mother, and the

hospital, where their child was delivered, arguing that their child's kidney

condition would have been preventable had the OBGYN and the hospital personnel

personally informed the subsequent treating physician of the child's adverse

sonogram results. However, the question of causation was taken away from the

jury when the trial court entered summary judgment in favor of the defendants,

- 18 -

concluding that the alleged negligence of the OBGYN and the hospital could not have been "the legal cause of the child's condition because [the subsequent treating physician] . . . had in fact been informed of the sonogram results by the child's parents and grandparents, and testified that being also told by the [OBGYN] or the hospital personnel would have made no difference." Id. at 856. On appeal, the Third District reversed, explaining that the subsequent treating physician's testimony as to what he would or would not have done if the OBGYN or hospital personnel had personally informed him of the results, although admissible, could not be given "conclusive effect" as a matter of law, and that the issue of causation was for the jury to determine. Id. at 856-57.

Similarly, in Goolsby, 847 So. 2d at 1002-03, the issue of causation was taken from the jury when the trial court entered a directed verdict for the defendant physician, based on his argument that there was no evidence that the subsequent treating physician would have changed her treatment if the defendant had read the x-rays properly and informed her that the x-rays indicated hip dysplasia in the patient. On appeal, the Fifth District reversed, explaining that it disagreed that "the negligent failure to diagnose a condition cannot be the cause of damages if a subsequent treater testifies that he would have shrugged off a correct diagnosis," especially since the subsequent treating physician in Goolsby did not testify that she would have ignored the correct diagnosis if it had been given, and concluding

- 19 -

that "the evidence was sufficient to pose to the jury the question [of] whether [the defendant's] alleged negligence in reading an x-ray as normal caused damages to the [patient]." Id.

In this case, the defendant, Dr. Dickens, moved for a directed verdict, arguing that the plaintiffs failed to present evidence of causation given the subsequent treating physician's testimony that, even if Dr. Dickens had ordered the cervical MRI in July 2003 and the results were the same as those in September 2003, he still would not have operated on the neck at that time. Saunders, 103 So. 3d at 876. However, unlike Muñoz and Goolsby, the trial court denied the motion for a directed verdict, finding that the issue of causation was for the jury to determine. Id. Thus, the case actually went to the jury, and the jury returned a verdict in favor of Dr. Dickens. Id. This is the essential factor that distinguishes this case from Muñoz and Goolsby.

Because the Fourth District's decision is factually distinguishable from Muñoz and Goolsby, there is no express and direct conflict, and this Court does not have jurisdiction.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Fourth District – Case No. 4D09-5302

(Broward County)

Douglas F. Eaton of Eaton & Wolk, PL, Miami, Florida,

    for Petitioner

Nancy W. Gregoire of Kirschbaum, Birnbaum, Lippman & Gregoire, PLLC, Fort Lauderdale; and Richard T. Woulfe of Bunnell and Woulfe P.A., Fort Lauderdale, Florida,

    for Respondent

Edward J. Carbone of Carlton Fields, P.A., Tampa, Florida

    for Amicus Curiae The Florida Defense Lawyers' Association

George A. Vaka and Nancy Ann Lauten of Vaka Law Group, Tampa, Florida,

    for Amicus Curiae The Florida Justice Association