DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ALEXIS CANTORE,** a minor, by and through her natural parents and
legal guardians, **FELIX** and **BARBARA CANTORE;** and **FELIX
CANTORE** and **BARBARA CANTORE,** individually,
Appellants,

v.

**WEST BOCA MEDICAL CENTER, INC.,** d/b/a **WEST BOCA MEDICAL
CENTER;** and **VARIETY CHILDREN'S HOSPITAL,** d/b/a **MIAMI
CHILDREN'S HOSPITAL,**
Appellees.

No. 4D13-1985

[September 24, 2015]

CORRECTED OPINION

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm
Beach County; Lucy Chernow Brown, Judge; L.T. Case No.
502010CA024815XXXXMB.

Philip M. Burlington and Andrew A. Harris of Burlington &
Rockenbach, P.A., West Palm Beach, and Linda A. Alley of Schlesinger Law
Offices, P.A., Fort Lauderdale, for appellants.

Michael K. Mittelmark and Meghan K. Zavoina of Michaud, Mittelmark,
Marowitz & Asrani, P.L.L.C., Boca Raton, for appellee West Boca Medical
Center, Inc., d/b/a West Boca Medical Center.

Elliot H. Scherker, Julissa Rodriguez and Stephanie L. Varela of
Greenberg Traurig, P.A., Miami, and Norman M. Waas and Scott E.
Solomon of Falk, Waas, Hernandez, Cortina, Solomon & Bonner, P.A.,
Coral Gables, for appellee Variety Children's Hospital, d/b/a Miami
Children's Hospital.

ROBY, WILLIAM L., Associate Judge.

This is a sad case which emphasizes that bad things sometimes just
happen in life and it is nobody's fault. We affirm on all counts but write
to distinguish the facts of this case as they relate to expert physician

testimony from those in *Saunders v. Dickens*, 151 So. 3d 434 (Fla. 2014), and to explain why the law as set out in *Saunders* does not apply to the facts in this case.

## FACTS

Alexis Cantore, a minor, and her parents Felix and Barbara Cantore, appeal from an adverse jury verdict in their medical malpractice action against West Boca Medical Center ("WBMC") and Variety Children's Hospital (a.k.a. Miami Children's Hospital ("MCH")).

In 2006, two years before the illness that gave rise to this case, when Alexis Cantore was twelve years old, she was diagnosed with hydrocephalus, a condition resulting from a build-up of excess cerebral spinal fluid within the cranium. Her condition resulted from a benign tumor which grew and blocked the outflow of the fluid which normally circulates around the brain. In 2006, she underwent a procedure, known as an Endoscopic Third Ventriculostomy ("ETV"), to remove the blockage. The procedure, which was performed at MCH, relieved the problem without causing Alexis any permanent injury.

However, scar tissue began to develop; a December 2007 CT scan at WBMC showed fluid starting to accumulate around her brain again. MRIs in March and June 2008 confirmed that a blockage was occurring again. A doctor at MCH scheduled Alexis for an ETV on July 28, 2008.

However, on July 3, 2008, at 2:30 p.m., Alexis began experiencing painful headaches and vomiting. Alexis's parents called MCH; a nurse told them to bring Alexis to the nearest hospital for a CT scan if they could not make it to MCH. Alexis was taken by ambulance to WBMC, arriving at 4:29 p.m. She was triaged and, on a three-tiered scale of categories (emergent, urgent and non-urgent), was listed in the middle category as "urgent." "Urgent" patients are those who are sick and require care, but are able to progress. In contrast, "emergent" patients may deteriorate quickly and need interventions, while "non-urgent" patients may have something like a laceration or a bite, which requires care but is not a medical emergency. The triage nurse on duty, in categorizing Alexis as "urgent," noted that she was awake and alert, moving all extremities, had a normal neurological exam, and a normal pupillary response, which was not indicative of an impending brain herniation.

Dr. Freyre-Cubano ("Dr. Freyre"), a pediatrician who was working in the WBMC emergency room, ordered a CT scan STAT at 4:47 p.m., before examining Alexis. Dr. Freyre first evaluated Alexis and noted that she had a normal pupillary exam. A nurse also noted no deficits to Alexis's eyes.

2

Dr. Freyre performed another eye exam which showed that Alexis's pupils were equal and reactive to light. A radiologist read the new CT scan, compared it with the previous one from December 2007, and confirmed in a report that Alexis's condition was worsening, and that the ventricles were larger than they had been on the previous CT scan. The findings were "consistent with worsening hydrocephalus."

By 5:40 p.m., Dr. Freyre had reviewed the report on the CT scan and called Dr. Sandberg, the on-call pediatric neurosurgeon at MCH, regarding transferring Alexis to MCH. At that time, Dr. Freyre told Dr. Sandberg that Alexis was "stable." This became an important issue at trial and now on appeal.

Dr. Freyre spoke with MCH's emergency department physicians regarding transferring Alexis via MCH's helicopter transportation service, known as "LifeFlight." About twenty minutes later, the MCH dispatcher for LifeFlight received the request for transport.

A WBMC nurse called the operations administrator at MCH, and apparently learned that the pilots on shift were approaching the maximum twelve hours of flight time and Alexis's transport would be completed by the on-coming pilots. LifeFlight's estimated arrival time was 7:00 p.m.

At 6:22 p.m., Alexis had an episode of vomiting, during which her heart rate briefly dropped to 55. A WBMC nurse then contacted a MCH Pediatric Intensive Care Unit ("PICU") nurse to update them. Dr. Freyre noted that she had called the MCH emergency department physician regarding Alexis's transfer and gave the necessary information.

Alexis was transferred to LifeFlight care at 7:25 p.m. She was examined by a LifeFlight nurse. The neurological assessment at that time was that Alexis was asleep, non-verbal and oriented as to person. When she was awakened, she was able to respond to her mother by nodding her head, and her pupils were equal, round and reactive to light. She had a Glasgow Coma Scale score of 13, with a perfect score being 15. She had a decrease in her speech. The helicopter lifted off at 8:09 p.m.

During the flight, Alexis suffered an acute decompensation. By the time she landed at MCH at 8:25 p.m., she had suffered a brain herniation. Accordingly, instead of taking Alexis to PICU, hospital personnel took her straight to the ER. Alexis arrived in very critical condition. Dr. Sandberg did an emergent ventriculostomy, in which he drilled a hole into her skull to insert a catheter, thereby relieving pressure on the brain. This procedure saved her life. However, Alexis suffered permanent brain

damage; she has significant mental impairment and must be fed through a tube. She will never be able to work or live independently.

Alexis's parents sued WBMC and MCH, alleging that they had not provided proper medical treatment. In a deposition that was read to the jury at trial, MCH's counsel asked hypothetical questions as to how Dr. Sandberg would have treated Alexis had she arrived at MCH an hour or two earlier. MCH's counsel asked Dr. Sandberg whether Alexis would have been intubated, assuming that she had remained stable, alert and oriented as to place, person, and time, and was at all times neurologically intact through transport. Dr. Sandberg said no, because the breathing tube is uncomfortable and requires sedation so that patients cannot speak.

MCH's counsel also asked whether Alexis would have ended up herniating if she had arrived one to two hours earlier at MCH. Dr. Sandberg answered that even if she had arrived two hours earlier it would have been the exact same outcome because she would have still gotten a ventriculostomy when she deteriorated. He stated that if she was awake, alert and oriented as to place, person and time, and her ventricles looked worse, he would have arranged for a procedure to be done that night or the next morning; she still would have deteriorated and wound up getting the ventriculostomy in the ER or the PICU, which was exactly what happened.

## ANALYSIS

The Cantores now argue, in relevant part, that the trial court abused its discretion in allowing Dr. Sandberg's hypothetical deposition testimony as he was a subsequent treating physician explaining how he would have treated Alexis under a different set of circumstances (i.e., what he would have done had Alexis arrived two hours earlier in stable condition). The Cantores point out that, in allowing the testimony, the trial court relied on *Ewing v. Sellinger*, 758 So. 2d 1196 (Fla. 4th DCA 2000), and *Saunders v. Dickens*, 103 So. 3d 871 (Fla. 4th DCA 2012) (*Saunders I*). After the trial, however, *Saunders* was overruled and *Ewing* was disapproved of by the Florida Supreme Court. *See Saunders v. Dickens*, 151 So. 3d 434, 443 (Fla. 2014) (*Saunders II*).

Rulings on the admission of evidence are reviewed under the abuse of discretion standard. *See Simmons v. State*, 934 So. 2d 1100, 1116-17 (Fla. 2006), *cert. denied*, 549 U.S. 1209 (2007). The trial court abuses its discretion only if the evidentiary ruling is based on either an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

4

In *Saunders II*, the Florida Supreme Court held that "a physician cannot insulate himself or herself from liability for negligence by presenting a subsequent treating physician who testifies that adequate care by the defendant physician would not have altered the subsequent care." 151 So. 3d at 442. The Court found that this testimony was irrelevant and inadmissible:

> Medical malpractice actions often involve a battle of expert witnesses, and each party often presents testimony by experts with respect to what a reasonably prudent physician would have done and the effect that such reasonable care would have had on the patient. It is then the role of the jury to determine how a reasonably prudent physician would have acted. Because the central concern in medical malpractice actions is the reasonably prudent physician standard, the issue of whether a treating physician acted in a reasonably prudent manner must be determined for each individual physician who is a defendant in a medical malpractice action. A subsequent treating physician simply may not be present at the time a defendant physician makes an allegedly negligent decision or engages in a potentially negligent act. Further, it is not only the final physician, but rather each treating physician who must act in a reasonably prudent manner.

*Id.* at 442. Accordingly, allowing defendant physicians to present subsequent physician testimony that care would not have been altered had the defendant physician exercised adequate care

> would alter the long-established reasonably prudent physician standard where the specific conduct of an individual doctor in a specific circumstance is evaluated. It would place a burden on the plaintiff to somehow prove causation by demonstrating that a subsequent treating physician would not have disregarded the correct diagnosis or testing, contrary to his or her testimony and irrespective of the standard of care for the defendant physician. To require the plaintiff to establish a negative inappropriately adds a burden of proof that simply is not required under the negligence law of this State.

*Id.*

In *Saunders,* the patient went to a neurologist complaining of pain,

cramping, and tingling in his extremities, including the hands. 151 So. 3d at 436. The neurologist diagnosed peripheral neuropathy due to diabetes but didn't perform a test to confirm it. *Id.* The patient was admitted to the hospital and a MRI of his lumbar spine showed severe stenosis. *Id.* No MRI of the upper spine was done. *Id.* A second doctor, a neurosurgeon, concluded that lumbar surgery was necessary. *Id.* at 437. After the surgery, the patient's hands worsened; MRI's of his cervical and thoracic spine showed compression. *Id.* Before his scheduled surgery could take place, the patient's condition degenerated into quadriplegia. *Id.* In his medical malpractice suit against the first physician, the patient claimed he had failed to timely diagnose and treat the cervical compression. *Id.* The defendant physician introduced testimony from the second physician that, even if he had had the results of the cervical MRI earlier, he would not have operated on the neck earlier because the patient had not yet had problems with his arms. *Id.* at 438. The Court in *Saunders II* found the second physician's testimony to be irrelevant and inadmissible. *Id.* at 443.

In the medical malpractice suit in *Ewing*, parents claimed that the obstetricians who provided prenatal care to the mother during labor should have performed a risk assessment, which would have established that a physician should have been present during labor. 758 So. 2d at 1197. During labor, the mother suffered permanent injury and the child was born cyanotic from lack of oxygen. *Id.* According to the parents, had the physician been present earlier, he would have avoided the injury by performing a cesarean section. *Id.* However, the physician testified that even if he had been present, he would not have performed a cesarean section earlier because the labor was adequately progressing. *Id.* at 1198. *Saunders II* disapproved of the physician's testimony as that of a subsequent treating physician insulating the defendant obstetricians. 151 So. 3d at 442.

In both *Saunders* and *Ewing*, the subsequent treating physician's care began after the negligent care at issue had occurred. This is also reflected in the conflict cases that the Florida Supreme Court relied upon in *Saunders II*. *See Munoz v. S. Miami Hosp., Inc.*, 764 So. 2d 854 (Fla. 3d DCA 2000) (failure of OB/GYN or other hospital personnel to inform pediatrician of sonogram results), *rev. denied*, 789 So. 2d 348 (Fla. 2001); *Goolsby v. Qazi*, 847 So. 2d 1001 (Fla. 5th DCA) (failure of doctor to inform pediatrician of hip dysplasia demonstrated on x-ray), *rev. denied*, 859 So. 2d 515 (Fla. 2003).

As such, the facts in *Ewing* and *Saunders* are distinguishable from the facts in this case, as Dr. Sandberg was a co-treating physician, and thus

6

his role squarely exceeded that of a subsequent treating physician. Dr. Sandberg's involvement commenced by 5:40 p.m., when Dr. Freyre requested his expertise in Alexis's neurological management until the transfer to MCH was completed. Alexis's condition required proper pediatric neurosurgical evaluation and treatment; WBMC did not have pediatric neurosurgical staff capable of treating her, and Dr. Sandberg was the pediatric neurosurgeon on-call at MCH. It was undisputed that at some point Dr. Sandberg would have to perform a procedure to relieve the intracranial pressure on Alexis's brain. Accordingly, WBMC medical personnel, including Dr. Freyre, continually followed his instructions, heeded his recommendations, and noted his preferences. Thus, Dr. Sandberg essentially became a co-treating physician or, at a minimum, a consulting treating physician.

As Dr. Sandberg played such an influential role in the care at issue, his answers to the hypotheticals posed had bearing on his own actions as well. Accordingly, when Dr. Sandberg testified as to hypotheticals involving Alexis's earlier arrival at MCH, he was not "a subsequent treating physician [testifying] that adequate care by the defendant physician would not have altered the subsequent care," *Saunders II*, 151 So. 3d at 442; rather, he was explaining **his** medical decision-making process and how different decisions made by **him** would have impacted Alexis's neurological status and condition, and thereby affecting his decision to perform an emergent ventriculostomy versus a scheduled operative procedure later that evening. While Dr. Freyre's actions in this specific situation were questions of fact for the jury (i.e. whether he correctly informed Dr. Sandberg regarding Alexis's condition), Dr. Sandberg's testimony as to what he would have done was based on his understanding of Alexis's condition at that time.

Appellants herein have somewhat understated Dr. Sandberg's actual critical involvement in Alexis's care on July 3, 2008, prior to her actual arrival at MCH. The level of care and instruction given by Dr. Sandberg prior to the transfer is essentially inseparable from Dr. Freyre's alleged failure to appropriately treat Alexis prior to transport. Florida law is clear that the jury should hear from a plaintiff's treating physicians—as in more than one, when there are more than one involved—regarding their care, recommendations, and medical decision-making. *See Ryder Truck Rental, Inc. v. Perez*, 715 So. 2d 289, 290 (Fla. 3d DCA 1998). However, as Dr. Sandberg's testimony was indeed introduced, the jury was properly allowed to hear his testimony as a co-treating/consulting or "hybrid" treating physician expert witness, including his complete medical decision-making rationale, especially where his treatment recommendations prior to Alexis's brain herniation hinged upon his

education, training and experience.

Further, in order for the jury to be able to determine how a reasonably prudent physician would have acted in this case, it was necessary for the jury to hear from experts on both sides of the litigation. This included hearing from Dr. Sandberg regarding when he normally performs or when it might be necessary to perform an emergent ventriculostomy versus a regularly scheduled ventriculostomy. Dr. Sandberg was asked deposition questions based on record evidence. His opinions regarding the timing of intervention related directly to his field of expertise and those questions and answers were appropriately admitted at trial. Objections, based on speculation and improper hypothetical, to the admissibility of Dr. Sandberg's testimony were properly overruled because as a treating physician, neurosurgeon, and expert on July 3, 2008, Dr. Sandberg was qualified to answer even questions which assumed certain facts which did not occur, as experts are allowed to do.

Appellants' strategy during the course of the litigation and at trial was to demonstrate that Dr. Freyre failed to appreciate Alexis's true condition and as a result provided inaccurate information to multiple healthcare providers at MCH, including, but not limited to, Dr. Sandberg. In fact, the jury heard Dr. Sandberg's testimony that **he would have made different recommendations** to intubate and administer diuretics had he been told Alexis was neurologically deteriorating as Appellants suggested. Appellants also argued that had Alexis been intubated and given diuretics, this outcome may have been avoided. Appellants' trial counsel's hypothetical questions to Dr. Sandberg assumed facts with inferences favoring their version of the case, that is, Alexis was symptomatic for over an hour, was drowsy, dizzy, weak, had blurred vision, vomiting too often to count, slow to respond to commands and obviously ill. Appellants' trial counsel also instructed Dr. Sandberg in questions to him, that Alexis was exhibiting those signs and symptoms and was not "awake, alert and oriented like she's just fine."

Nevertheless, Dr. Sandberg continued to express his opinion in terms of what **he would have done under either version of the facts,** but emphasized that the key point was whether Alexis was awake, following commands, and oriented. There was ample evidence at trial that the timing of a brain herniation is unpredictable even in the setting of increasing intracranial pressure. Similarly, physicians with experience in treating patients with hydrocephalus testified that a rapid deterioration is a rare event in patients with chronic hydrocephalus, such as Alexis. Which actual condition Alexis was in while in the care of Dr. Freyre and WBMC was thus a decision appropriately left up to the jury's

8

determination. Dr. Sandberg testified as to what he understood the relevant evidence of Alexis's medical condition to be, not that the care by Dr. Freyre would or would not have altered Dr. Sandberg's treatment after the transfer to MCH. Therefore, the introduction of his testimony does not fall under the type of testimony proscribed by *Saunders II*.

Regardless of these jury questions, it is apparent that Dr. Sandberg's testimony regarding his recommendations for neurological management prior to transfer and his decision to proceed with neurosurgical intervention following transfer cannot be separated. In other words, the import of Dr. Sandberg's testimony was to provide a medical explanation as to the appropriate neurosurgical treatment **under both the Appellants' and Appellees' views of what actually was Alexis's condition while at WBMC**. Had the jury found that Dr. Freyre failed to appreciate Alexis's neurological deterioration and further provided inaccurate information to Dr. Sandberg as Appellants asserted at trial, the jury would have also concluded that Dr. Sandberg would have recommended diuretics, intubated her and placed a ventriculostomy when she was no longer staying awake and following medical care provider commands.

Moreover, Appellants were in no way hindered or restricted from expressing their theory of liability to the jury. Appellants tried their case by attempting to establish that the negligence of Dr. Freyre was a legal cause of Alexis's injuries. It was Appellants' theory of the case and litigation strategy to portray Dr. Freyre as a less-than-competent, improperly trained emergency room physician, who lacked board certification and was reckless, ultimately causing Alexis's damages. Dr. Freyre had settled out of this suit before the trial commenced. The trial court correctly determined that in order to preserve WBMC's remaining defense to the allegation that it was vicariously liable for Dr. Freyre's conduct, Dr. Freyre would have had to have been added to the verdict form, similar to a *Fabre* defendant. *See Fabre v. Marin,* 623 So. 2d 1182 (Fla. 1993).

Indeed, Dr. Freyre's name was on the verdict form and her action (or inaction) was the focus of the entire five-week trial. Just as this Court recognized in *Loureiro v. Pools By Greg, Inc.,* 698 So. 2d 1262, 1264 (Fla. 4th DCA 1997), the issue of the defendant's negligence "was fully litigated at trial and the presence of the *Fabre* defendants on the verdict form did not disturb the jury's ability to consider that matter." In this case, the jury weighed all the facts and evidence and ultimately concluded that Dr. Freyre was not liable and, therefore, Defendant WBMC was not vicariously liable as well. Furthermore, Dr. Sandberg was at all times a neutral third-party witness with no motivation to deny wrongdoing or avoid liability as

he was never a defendant, unlike the testifying neurosurgeon in *Saunders*.

Accordingly, Dr. Sandberg's testimony was properly admitted as it was based on admissible hypothetical questions from both sides. The trial court's evidentiary decisions were legally correct and were not an abuse of the court's sound discretion, despite the fact that *Saunders* and *Ewing* have since been overturned. The jury clearly rejected Plaintiffs' theory of the case after being presented with all of Plaintiffs' evidence and in light of evaluating Dr. Sandberg's testimony as well as the testimony of numerous other medical care providers. The jury found that Dr. Freyre and WBMC did not act with reckless disregard. The jury system worked. For these reasons, and as sad and heart-wrenching as this case may be, judgment for Appellees must be affirmed.

MAY and KLINGENSMITH, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***