PER CURIAM.
Because the treating physician's deposition testimony regarding how he would have treated Alexis Cantore had she arrived at Miami Children's Hospital earlier was inadmissible, we quash the Fourth District Court of Appeal's decision in Cantore v. West Boca Medical Center, Inc. , 174 So.3d 1114 (Fla. 4th DCA 2015).[1]
BACKGROUND
In July 2008, Alexis Cantore suffered permanent brain damage while being treated for hydrocephalus at West Boca Medical Center (WBMC) and Miami Children's Hospital (MCH). The Fourth District described the background of this case as follows:
In 2006, two years before the illness that gave rise to this case, when Alexis Cantore was twelve years old, she was diagnosed with hydrocephalus, a condition resulting from a build-up of excess cerebral spinal fluid within the cranium. Her condition resulted from a benign tumor which grew and blocked the outflow of the fluid which normally circulates around the brain. In 2006, she underwent a procedure, known as an Endoscopic Third Ventriculostomy ("ETV"), to remove the blockage. The procedure, which was performed at MCH, relieved the problem without causing Alexis any permanent injury.
However, scar tissue began to develop; a December 2007 CT scan at WBMC showed fluid starting to accumulate around her brain again. MRIs in March and June 2008 confirmed that a blockage was occurring again. A doctor at MCH scheduled Alexis for an ETV on July 28, 2008.
However, on July 3, 2008, at 2:30 p.m., Alexis began experiencing painful headaches and vomiting. Alexis's parents called MCH; a nurse told them to bring Alexis to the nearest hospital for a CT scan if they could not make it to MCH. Alexis was taken by ambulance to WBMC, arriving at 4:29 p.m. She was triaged and, on a three-tiered scale of *1034 categories (emergent, urgent and non-urgent), was listed in the middle category as "urgent." "Urgent" patients are those who are sick and require care, but are able to progress. In contrast, "emergent" patients may deteriorate quickly and need interventions, while "non-urgent" patients may have something like a laceration or a bite, which requires care but is not a medical emergency. The triage nurse on duty, in categorizing Alexis as "urgent," noted that she was awake and alert, moving all extremities, had a normal neurological exam, and a normal pupillary response, which was not indicative of an impending brain herniation.
Dr. Freyre-Cubano ("Dr. Freyre"), a pediatrician who was working in the WBMC emergency room, ordered a CT scan STAT at 4:47 p.m., before examining Alexis. Dr. Freyre first evaluated Alexis and noted that she had a normal pupillary exam. A nurse also noted no deficits to Alexis's eyes. Dr. Freyre performed another eye exam which showed that Alexis's pupils were equal and reactive to light. A radiologist read the new CT scan, compared it with the previous one from December 2007, and confirmed in a report that Alexis's condition was worsening, and that the ventricles were larger than they had been on the previous CT scan. The findings were "consistent with worsening hydrocephalus."
By 5:40 p.m., Dr. Freyre had reviewed the report on the CT scan and called Dr. Sandberg, the on-call pediatric neurosurgeon at MCH, regarding transferring Alexis to MCH. At that time, Dr. Freyre told Dr. Sandberg that Alexis was "stable." This became an important issue at trial and ... on appeal.
Dr. Freyre spoke with MCH's emergency department physicians regarding transferring Alexis via MCH's helicopter transportation service, known as "LifeFlight." About twenty minutes later, the MCH dispatcher for LifeFlight received the request for transport.
A WBMC nurse called the operations administrator at MCH, and apparently learned that the pilots on shift were approaching the maximum twelve hours of flight time and Alexis's transport would be completed by the on-coming pilots. LifeFlight's estimated arrival time was 7:00 p.m.
At 6:22 p.m., Alexis had an episode of vomiting, during which her heart rate briefly dropped to 55. A WBMC nurse then contacted a MCH Pediatric Intensive Care Unit ("PICU") nurse to update them. Dr. Freyre noted that she had called the MCH emergency department physician regarding Alexis's transfer and gave the necessary information.
Alexis was transferred to LifeFlight care at 7:25 p.m. She was examined by a LifeFlight nurse. The neurological assessment at that time was that Alexis was asleep, non-verbal and oriented as to person. When she was awakened, she was able to respond to her mother by nodding her head, and her pupils were equal, round and reactive to light. She had a Glasgow Coma Scale score of 13, with a perfect score being 15. She had a decrease in her speech. The helicopter lifted off at 8:09 p.m.
During the flight, Alexis suffered an acute decompensation. By the time she landed at MCH at 8:25 p.m., she had suffered a brain herniation. Accordingly, instead of taking Alexis to PICU, hospital personnel took her straight to the ER. Alexis arrived in very critical condition. Dr. Sandberg did an emergent ventriculostomy, in which he drilled a hole into her skull to insert a catheter, thereby relieving pressure on the brain. This procedure saved her life. However, Alexis suffered permanent brain damage; she has significant mental impairment *1035 and must be fed through a tube. She will never be able to work or live independently.
Id. at 1115-17.
In 2010, Alexis and her parents, Felix and Barbara Cantore, sued WBMC and MCH, alleging that they had not provided proper medical care for Alexis on July 3, 2008. The Cantores presented testimony from several expert witnesses regarding the timing of Alexis' transfer from WBMC to MCH and the care she received from the LifeFlight crew. One of the witnesses, Dr. William Loudon, a pediatric neurosurgeon, testified that, based on his understanding of Alexis' condition before she herniated, if she had come under his care prior to the herniation, he would have performed an emergency ventriculostomy. In Dr. Loudon's opinion, if Alexis had received earlier relief from the build-up of cerebrospinal fluid in her brain, the herniation could have been prevented.
Over the Cantores' objection, counsel for WBMC was permitted to publish to the jury the deposition of Dr. Sandberg, the pediatric neurosurgeon at MCH who operated on Alexis, in which Dr. Sandberg answered hypothetical questions as to how he would have treated Alexis had she arrived at MCH an hour or two earlier. The trial court also permitted Dr. Steven White, WBMC's expert on pediatric emergency medicine, to testify that Dr. Sandberg's statement as to what he would have done had Alexis arrived at MCH earlier was consistent with what other neurosurgeons would have done.
Ultimately, the jury returned a verdict in favor of WBMC and MCH. The Fourth District affirmed, concluding that this Court's decision in Saunders v. Dickens , 151 So.3d 434 (Fla. 2014), did not prevent the admission of Dr. Sandberg's deposition testimony. Cantore , 174 So.3d at 1117-21.
ANALYSIS
The Cantores argue that the trial court abused its discretion in admitting Dr. Sandberg's deposition testimony about what he would have done had Alexis arrived at MCH earlier because such testimony is prohibited by this Court's decision in Saunders . We agree and quash the Fourth District's decision.[2]
A trial court's admission of evidence is reviewed for an abuse of discretion. See Special v. W. Boca Med. Ctr. , 160 So.3d 1251, 1265 (Fla. 2014).
The elements of a medical malpractice claim are: "(1) a duty by the physician, (2) a breach of that duty, and (3) causation." Saunders , 151 So.3d at 441 (citing Gooding v. Univ. Hosp. Bldg., Inc. , 445 So.2d 1015, 1018 (Fla. 1984) ). To establish that a physician breached the duty of care *1036 owed to the patient, the plaintiff must prove that "the care provided by the physician was not that of a reasonably prudent physician ." Id. As to the element of causation, "Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." Gooding , 445 So.2d at 1018.
In Saunders , this Court addressed a plaintiff's burden of proof in medical malpractice cases. The patient in Saunders went to a neurologist complaining of back and leg pain, unsteadiness, cramps in his hands and feet, numbness in his hands, and tingling in his feet. Saunders , 151 So.3d at 436. The neurologist determined that the issues with the patient's hands were caused by peripheral neuropathy due to diabetes, but the neurologist did not perform a test to confirm the diagnosis. Id. The neurologist recommended that the patient be admitted to the hospital, and he ordered an MRI of the patient's brain and lumbar spine. Id. "[T]he MRI of the lumbar spine demonstrated severe stenosis (narrowing) of the spinal canal." Id. Based on these results, the neurologist referred the patient to a neurosurgeon for a consultation. Id. Unaware of any issues with the patient's upper extremities, the neurosurgeon performed a lumbar decompression procedure on the patient. Id. The patient's condition did not improve, so the neurosurgeon ordered additional MRIs, including a cervical MRI, which showed compression in both the lower back and neck. Id. The neurosurgeon recommended that cervical decompression surgery be performed, but the neurosurgeon did not schedule the surgery as planned. Id. A second neurosurgeon met with the patient and concluded that he "should undergo a second lumbar surgery and, at a later date, a cervical spine surgery." Id. at 437. "The [second] neurosurgeon performed the lumbar surgery, but the cervical spine surgery was never performed." Id. The patient's condition eventually degenerated into quadriplegia. Id.
In his medical malpractice claim against the neurologist, the patient in Saunders alleged that the neurologist had failed to timely diagnose his cervical compression. Id. The patient also filed a claim against the first neurosurgeon, but the parties settled before trial. Id. At trial, the patient presented expert testimony that the neurologist's failure to consider cervical cord compression as the cause of the patient's upper body symptoms was a breach of the standard of care. Id. The patient also presented expert testimony that, had a cervical decompression surgery been performed shortly after the time the patient first reported his symptoms, the patient "more likely than not would not have progressed to quadriplegia." Id. In rebuttal, the neurologist introduced depositions of the first neurosurgeon, which were taken before he settled with the patient. Id. at 438. In the depositions, the first neurosurgeon stated that, even if he had possessed the results of a cervical MRI when he initially met with the patient, "he would not have operated on the neck because [the patient] had not yet experienced problems with his upper extremities." Id. During closing argument, counsel for the neurologist "asserted that [the patient] had not established causation in light of [the first neurosurgeon's] testimony that he would not have changed the course of treatment even if [the neurologist] had ordered a cervical MRI." Id. at 439. The jury then returned a verdict in favor of the neurologist. Id.
However, this Court in Saunders stated, "[W]e hold that testimony that a subsequent treating physician would not have treated the patient plaintiff differently had the defendant physician acted within the applicable standard of care is irrelevant and inadmissible and will not insulate a defendant physician from liability for his *1037 or her own negligence." Id. at 443.[3] We explained:
Because the central concern in medical malpractice actions is the reasonably prudent physician standard, the issue of whether a treating physician acted in a reasonably prudent manner must be determined for each individual physician who is a defendant in a medical malpractice action. A subsequent treating physician simply may not be present at the time a defendant physician makes an allegedly negligent decision or engages in a potentially negligent act. Further, it is not only the final physician, but rather each treating physician who must act in a reasonably prudent manner.... To [allow testimony from a subsequent treating physician like that of the first neurosurgeon], would alter the long-established reasonably prudent physician standard where the specific conduct of an individual doctor in a specific circumstance is evaluated. It would place a burden on the plaintiff to somehow prove causation by demonstrating that a subsequent treating physician would not have disregarded the correct diagnosis or testing, contrary to his or her testimony and irrespective of the standard of care for the defendant physician. To require the plaintiff to establish a negative inappropriately adds a burden of proof that simply is not required under the negligence law of this State.
Id. at 442. Accordingly, this Court held that the closing argument by counsel for the neurologist regarding the element of causation was "a misstatement of the law," and "the trial court erred when it permitted ... counsel to mislead the jury during closing statements." Id. We also determined that the error was harmful because counsel for the neurologist "repeatedly relied on [the first neurosurgeon's] testimony in his improper burden-shifting statements" and, because the plaintiff was unable to explain that the first neurosurgeon's deposition was taken before he settled out of the case, "the jury was unaware that [the first neurosurgeon] was motivated by a desire to deny wrongdoing and avoid liability." Id. at 442-43.
In this case, Dr. Sandberg's deposition testimony in response to the hypotheticals from all the parties can be summarized as follows: Regardless of whether Alexis had arrived at MCH an hour or two earlier, at some point he would have performed an emergency ventriculostomy to save her life, and she still would have suffered permanent brain damage. Dr. Sandberg explained that this would have been the result regardless of the condition Alexis was in when she arrived. If Alexis had arrived earlier and had been in stable condition, Dr. Sandberg would have scheduled a surgery for later in the day, but Alexis likely would have deteriorated prior to the scheduled surgery, requiring the same type of emergency intervention she actually received. And if Alexis had arrived earlier and was in a deteriorated state (as the Cantores posited would have been the case), Dr. Sandberg would have proceeded with the emergency procedure at that time, just as he actually did several hours later.
The substance of Dr. Sandberg's testimony about how he would have treated Alexis under circumstances other than those that actually occurred is no different from the testimony from the subsequent treating physician in Saunders . In the parties' hypotheticals, Dr. Sandberg was not *1038 asked to explain the standard of professional care for transferring patients with hydrocephalus who exhibit symptoms like the ones Alexis was exhibiting. Nor was he asked his opinion about whether any of the other healthcare providers involved in Alexis' care on July 3, 2008, failed to meet that standard. In the context of the entire trial record, it is clear that the purpose of introducing the challenged portions of Dr. Sandberg's deposition testimony was to break the chain of causation between the alleged negligent conduct of WBMC or MCH, or both, and Alexis' injuries-i.e., to establish that Alexis still would have suffered permanent brain damage even if the hospitals and their staffs had effectuated a faster transfer from WBMC to MCH.[4] Therefore, Dr. Sandberg's testimony on that point was "irrelevant and inadmissible," Saunders , 151 So.3d at 443, and the trial court abused its discretion in allowing it to be read to the jury.
Contrary to the dissent's attempt to factually distinguish this case from Saunders, nothing in the four corners of Saunders provides that the admissibility of a subsequent treating physician's testimony about the causation element is affected by the subsequent treating physician also serving as an advisor to an initial treating physician or being referred to as a neutral and "hybrid" expert witness. Instead, in Saunders , this Court's focus was on the substance of the subsequent treating physician's testimony and its effect on the plaintiff's case. Similarly, here, the pertinent hypotheticals at issue concerned Dr. Sandberg's status as the subsequent treating physician and how his own subsequent treatment might have changed if any previous treating healthcare providers had acted differently (i.e., arranged a faster transfer).
Additionally, the error here was not harmless. See § 59.041, Fla. Stat. (providing that the harmless error test applies to the "improper admission or rejection of evidence"); Saunders , 151 So.3d at 442 (applying the harmless error test under these circumstances). "To test for harmless error [in civil appeals], the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict." Special , 160 So.3d at 1256.
Here, the Fourth District correctly pointed out that the Cantores were not "hindered or restricted" in expressing their theory of liability against WBMC and MCH. Cantore , 174 So.3d at 1121. Indeed, the Cantores presented multiple witnesses who testified that the actions of WBMC (including Dr. Freyre) and MCH fell below the applicable standard of care, causing Alexis to suffer permanent brain damage. However, counsel for WBMC and MCH relied on Dr. Sandberg's responses to the hypothetical questions to argue to the jury that the Cantores failed to meet their "promise" to show that the outcome in this case would have been different had Alexis arrived at MCH earlier than she did. In making this argument, counsel for WBMC and MCH each read directly from Dr. Sandberg's deposition, highlighting the erroneously admitted portions of his testimony. In Saunders , this Court expressly disapproved of this type of burden-shifting *1039 argument regarding the causation element of a medical malpractice claim. See 151 So.3d at 442. But for the erroneous admission of Dr. Sandberg's deposition testimony, counsel could not have made such an argument and put the Cantores in the position of needing to prove that Dr. Sandberg's testimony was false. Furthermore, the record reflects that during deliberations the jury twice asked to review Dr. Sandberg's deposition testimony. After a five-week long trial with 42 witnesses, this was one of only two witnesses the jury asked to hear from again. Finally, as the Cantores point out, Dr. Sandberg's testimony about how he would have treated Alexis if she had arrived at MCH earlier was bolstered by Dr. White's testimony that Dr. Sandberg's responses were "consistent" with his own experience with emergency ventriculostomies.
Accordingly, the erroneous admission of Dr. Sandberg's testimony was not harmless.[5]
CONCLUSION
For the foregoing reasons, Dr. Sandberg's testimony about how he would have treated Alexis had she arrived at MCH earlier was inadmissible and cannot be considered harmless error. Accordingly, we quash the Fourth District's decision in Cantore , reverse the judgment in favor of WBMC and MCH, and remand for a new trial.
It is so ordered.
LABARGA, C.J., and PARIENTE, QUINCE, and POLSTON, JJ., concur.
POLSTON, J., concurs with an opinion.
CANADY, J., dissents with an opinion, in which LAWSON, J., concurs.
LEWIS, J., recused.

We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.

We also agree with the Cantores that the trial court erred in entering a directed verdict in favor of WBMC and MCH on the application of section 768.13, Florida Statutes (2008), the Good Samaritan Act, which grants immunity from civil damages to any healthcare provider that provides "emergency services," unless the damages are the result of "reckless disregard." The threshold question in determining the applicability of the Good Samaritan Act is whether the healthcare provider was providing "emergency services" to the patient. But here there was conflicting evidence regarding whether Alexis was "stabilized and [was] capable of receiving medical treatment as a nonemergency patient" at the times relevant to the Cantores' allegations of medical malpractice. § 768.13(2)(b) 2.a., Fla. Stat. For example, there was testimony that immediately upon her arrival at WBMC "her level of consciousness began to wax and wane"; however, another witness testified that she was stable "[u]p until the very end of the transport." Therefore, due to the conflicting evidence about Alexis' condition, the question of whether the Good Samaritan Act applied should have been left to the jury. See Univ. of Fla. Bd. of Trs. v. Stone ex rel. Stone , 92 So.3d 264, 271 (Fla. 1st DCA 2012).

The dissent contends that we cannot base conflict jurisdiction on this statement because it is allegedly dicta rather than an issue of law this Court actually decided in Saunders . However, within the four corners of the Saunders decision, the majority of this Court expressly indicated that it was deciding this question of law, which is binding precedent.

The Fourth District stated that Dr. Sandberg's responses regarding the timing of Alexis' transfer "had bearing on his own actions as well," and in them "he was explaining his medical decision-making process and how different decisions made by him would have impacted Alexis's neurological status and condition." Cantore , 174 So.3d at 1119. However, the Cantores never alleged that Dr. Sandberg or any other provider acted negligently after Alexis arrived at MCH.

Because it was not preserved at trial, we do not address the Cantores' argument regarding the issue of agency and the inclusion of Dr. Freyre's name on the verdict form.