764 So.2d 854 (2000)
Gabriel MUNOZ, a minor, By and Through his parents and natural guardians, Marcos MUNOZ, Jr., and Ana M. Munoz, and Marcos Munoz, Jr., and Ana M. Munoz, individually, Appellants,
v.
SOUTH MIAMI HOSPITAL, INC., Richard L. Litt, M.D., Richard L. Litt, M.D., P.A., and Gonzalo De Quesada, M.D., Appellees.
No. 3D98-1661.
District Court of Appeal of Florida, Third District.
August 9, 2000.
*855 Ginsberg & Schwartz and Arnold Ginsberg, Miami; Sheldon J. Schlesinger, Ft. Lauderdale, for appellants.
Greenberg Traurig and Elliot H. Scherker, Miami; Michael S. Hacker, Miami; Tilghman & Vieth and Araly Herrera, Miami, for appellees.
Before SCHWARTZ, C.J., and JORGENSON and COPE, JJ.

ON MOTION FOR REHEARING
SCHWARTZ, Chief Judge.
Upon consideration of the motion for rehearing, which is otherwise denied, the majority opinion filed on April 19, 2000 is withdrawn and the following opinion is substituted in its place.
This is a medical malpractice action stemming from permanent kidney damage sustained by a newborn infant despite an adverse sonogram test which indicated the defect and expert evidence that prompt and efficient treatment, which was not appropriately rendered after the birth, would have corrected the condition. The child and his parents sued the obstetrician-gynecologist who treated the expectant mother and delivered the child, the hospital at which the child was delivered and stayed until he went home with the mother, an on-call physician who telephonically prescribed treatment for the infant during the hospital stay and the pediatrician who was primarily responsible for treating the child after delivery. While the case against the pediatrician, Dr. Ugalde, remains pending below, the trial judge entered summary judgment for the ob-gyn, the on-call physician, and the hospital. On this appeal we affirm as to the on-call physician, but reverse for trial as to the obstetrician and hospital.

I.
During her pregnancy, the mother, Ana Munoz, underwent a sonogram ordered by her obstetrician, Dr. Richard Litt. The test suggested that one of the fetus' kidneys might not be filtering properly. The maternal grandmother discussed the test results with Dr. Jose Ugalde, who had been the family pediatrician for many years. Dr. Ugalde advised that no action should be taken prior to birth.
Dr. Litt delivered Gabriel Munoz at South Miami Hospital. He recorded the questionable sonogram result in the chart of the child, for reference to the child's pediatrician for further studies after birth, but neither Dr. Litt nor any of the nurses or other hospital personnel who were well aware of them, personally informed Dr. Ugalde of the sonogram results.
Dr. Ugalde took over the child's care at the hospital. He saw the mother daily during her hospitalization and discussed the questioned kidney filtering with her and the maternal grandmother. He said he believed that based upon his examination, the child was fine and that he held this opinion despite his review of the nurses' and the progress notes in the hospital records.
While in the hospital the baby developed an elevated bilirubin count resulting in jaundice, and did not void normallyboth of which may together, but not necessarily individually, be symptomatic of kidney dysfunction. The hospital contacted Dr. DeQuesada, a pediatrician who was on-call for Dr. Ugalde, by telephone concerning the baby, but told him only of the bilirubin-jaundice problem. Dr. DeQuesada ordered treatment and that condition returned to normal. Dr. Ugalde resumed *856 responsibility for the child's care soon thereafter but never undertook appropriate treatment for the infant's kidney condition. After discharge from the hospital, however, it was demonstrated that Gabriel suffers from severe damage to one kidney and probably almost equal damage to the other one which the plaintiff's expert testimony demonstrated could have been prevented had the child been properly examined and treated after delivery.

II.
1. Our affirmance of the summary judgment in favor of the on-call physician is based on the clear showing that Dr. DeQuesada acted entirely correctly on the basis of the limited information conveyed by the hospital personnel.[1]
2. The liability of Dr. Litt and the hospital, however, should not have been taken from the jury. As to these defendants, the record contains direct, competent expert opinions that both Dr. Litt and the hospital's nurses deviated from the applicable standard of professional care by failing themselves directlyin addition to merely placing the information in the hospital recordsto inform Dr. Ugalde of the potentially (and actually) devastating results of the adverse sonogram. This alone is sufficient to preclude summary judgment, see generally Moore v. Morris, 475 So.2d 666 (Fla.1985), under principles concerning duties to warn which are applicable both generally, see Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla.1958), and with respect to medical situations such as this one in particular. See Visingardi v. Tirone, 193 So.2d 601 (Fla.1966); Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). Moreover, because both Dr. Litt and the nurses knew or should have known that Dr. Ugalde had not responded to the dangers presented by the sonogram results, the case invokes the rule that medical professionals must, under some circumstances, see to it that serious conditions which they know about be, in fact, remedied either by themselves or by someone else competent to do so. See Jackson v. Burton, 226 Ala. 483, 147 So. 414 (1933); Reynolds v. Dennison, 981 S.W.2d 641 (Mo.Ct.App.1998); Bateman v. Rosenberg, 525 S.W.2d 753 (Mo.Ct.App. 1975).[2]
The trial court based its contrary conclusions on the ground, and the appellees now claim, that none of this misconduct could have been the legal cause of the child's condition because Dr. Ugalde, whose job it was to treat it, had in fact been informed of the sonogram results by the child's parents and grandparents, and testified that being also told by the obstetrician or the hospital personnel would have made no difference. In several respects, this analysis is both factually and legally flawed.
In the first place, as the concurring opinion correctly points out, Dr. Ugalde's statements about what he would or would not have done in response to warnings which should have been but were never in fact given are themselves in internal conflict. Even if they were not, however, and while, contrary to our initial view, we do not believe that even speculative statements of this kind are inadmissible, cf. Drackett Products Co. v. Blue, 152 So.2d 463 (Fla.1963), they surely cannot be given conclusive effect. See Drackett, 152 So.2d at 463; Walker v. Florida Department of Business and Professional Regulation, 705 So.2d 652 (Fla. 5th DCA 1998); 29A Am.Jur.2d Evidence § 1445 (1994); Annot., Credibility of Witness Giving Uncontradicted *857 Testimony as Matter for Court or Jury, 62 A.L.R.2d 1191 (1958). Compare Ewing v. Sellinger, 758 So.2d 1196 (Fla. 4th DCA 2000)(considering effect of undisputed opinion of non-party physician as to his own conduct in hypothetical situation). It simply flies in the face of common sense, for example, to think that a physician would consider the statements of concerned lay relatives of the same import and impact as information conveyed with due concern and gravity by professional colleagues. And it is not for the defendants, who putatively violated their standard of care by failing to warn, to argue that their not doing so had no effect on the situation, when their doing the appropriate thing would have removed all doubt. As was said in Seley v. G.D. Searle & Co.:
[O]nly speculation can support the assumption that an adequate warning, properly communicated, would not have influenced the course of conduct adopted by a physician, even where the physician had previously received the information contained therein. "What the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case."
67 Ohio St.2d at 201, 423 N.E.2d at 839 (footnote omitted) (quoting Hamilton v. Hardy, 37 Colo.App. 375, 387, 549 P.2d 1099, 1109 (1976), overruled on different grounds by State Bd. of Medical Examiners v. McCroskey, 880 P.2d 1188 (Colo. 1994)).
In an even broader context, we believe that this situation may be viewed as one in which (a) Dr. Litt and the nurses stood on professional ceremony by failing to tell their fellow healthcare provider of what they knew he needed to know but was ignoring, with the result that the child was terribly harmed, and (b) Dr. Ugalde, perhaps out of a sense of guilt, of denial, or both, determined to let his fellow professionals off the hook by shouldering the entire responsibility for the devastating result himself. The determination of whether any of these perfectly permissible conclusions is accurately drawn from the circumstances is, however, not the job of judges. We can think of no case which more obviously invokes the rule that the resolution of issues of negligence and causation, in the light of all the circumstances, are what jury trials, and not motions for summary judgment, are for.
Affirmed in part and reversed in part.
JORGENSON, J., concurs.
COPE, J. (specially concurring).
Upon consideration of the motion for rehearing and the revised majority opinion, I withdraw my previous concurring opinion and substitute the following concurring opinion.
I concur as to the on-call physician, Dr. DeQuesada, and concur in the result (but not the reasoning) as to Dr. Litt and South Miami Hospital.
With regard to the hospital, when the mother arrived in labor, the admitting nurse took a statement from her regarding the ultrasound and the fact that the right kidney of the infant would need to be checked after birth. This was noted on the baby's chart, but the plaintiffs' nursing expert testified that this information should have been orally communicated as well to the pediatrician and the other nurses. There is no indication in the chart that this was done. Plaintiffs' expert indicated that this same information would mean that the nurses would have to give particular attention to the amount and nature of urinary output. The expert also testified that there is no indication on the chart that the nurses advised the pediatrician about what was apparently a failure of the infant to urinate for the first twenty-one hours.
With regard to Dr. Litt, there also remains a standard-of-care issue. The plaintiffs have offered an expert opinion that Dr. Litt had to initiate an immediate consultation with the pediatrician or a nephrologist *858 at the time the sonogram results were received, so that the situation could be monitored and arrangements be made for immediate follow up after delivery. The plaintiffs' experts say this because the circumstances require it, not because, as suggested in the majority opinion, a doctor will ignore the patient but listen to another doctor. Indeed, the plaintiffs' family testified that Dr. Ugalde had been the family pediatrician for twenty-three years and had always been responsive to their concerns.
There are no facts in the record to support the proposition that "Dr. Litt and the nurses knew or should have known that Dr. Ugalde had not responded to the dangers presented by the sonogram results...." Majority opinion at 856. Plaintiffs' experts did not rest their opinions on that rationale.
There is also nothing in the record to support the statement that "Dr. Ugalde, perhaps out of a sense of guilt, of denial, or both, determined to let his fellow professionals off the hook by shouldering the entire responsibility for the devastating result himself." Id. at 857. To begin with, Dr. Ugalde denies that he was negligent at all. His position is that he examined the infant appropriately, that there were no clinical signs of a kidney problem, and that the problem developed post-discharge. Dr. Ugalde has not volunteered to accept any blame, much less the entire blame. As to the sonogram, Dr. Ugalde denies that the mother or grandmother told him about it, and states that he did not read that part of the baby's chart on which Dr. Litt left a specific note regarding the sonogram results.[3]
The defendants have argued in this case that Dr. Ugalde testified he would not have acted any differently had he known about the sonogram. However, later in the same deposition he testified that if he had known that the child was diagnosed prenatally with having a possible right kidney hydronephrosis, he would have consulted with a nephrologist.
I agree that the products liability case of Drackett Products Co. v. Blue, 152 So.2d 463 (Fla.1963), does not render Dr. Ugalde's testimony inadmissible in this medical malpractice case. Plaintiffs' case against Dr. Litt and South Miami Hospital hinges on the contention that if Dr. Litt or the nurses had acted differently then Dr. Ugalde would have taken other steps and the kidney problem would have been detected and timely corrected. Plaintiffs have thereby opened the door to the question whether Dr. Ugalde would have proceeded differently under plaintiffs' hypothetical set of facts. Plainly defendants can reply to the hypothetical set of facts and can elicit from Dr. Ugalde what he would have done. Drackett involved no such issue.[4] And even Drackett does not forbid getting at the same question a different way, by asking what the standard of care called for under the hypothetical set of facts, or what Dr. Ugalde's customary practice was when confronted by the same or similar facts. What weight to give such testimony is for the jury.
I do not believe that Drackett, a products liability case, applies to a medical malpractice case at all, and Judge Ervin of the First District has questioned whether Drackett has any continuing validity for any purpose. See Singletary v. Lewis, 584 So.2d 634, 641 & n. 2 (Fla. 1st DCA 1991) (Ervin, J., concurring in part and dissenting in part). Assuming arguendo that it could be applied here, the key passage in Drackett is the following:
A statement by a witness as to what action he would have taken if something had occurred which did not occurparticularly in those instances where such *859 testimony is offered for the purpose of supporting a claim for relief or damagesor what course of action a person would have pursued under certain circumstances which the witness says did not exist will ordinarily be rejected as inadmissible and as proving nothing.
152 So.2d at 465 (emphasis added). A medical malpractice case of the type now before us is not the "ordinary" situation referred to by Drackett, because the medical professional's testimony is measured against the yardstick of the standard of care.
I respectfully disagree with the majority opinion's statement that "`[w]hat the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case.'" Majority opinion at 857 (quoting Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 423 N.E.2d 831, 839 (1981)). This is contrary to Florida law, which states:
"On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."
Gooding v. University Hospital Building, Inc., 445 So.2d 1015, 1018 (Fla.1984) (citation omitted; emphasis added). Florida law controls, not Ohio's Seley decision.[5]
For the reasons stated, I concur that the summary judgment must be reversed as to Dr. Litt and the hospital.
NOTES
[1] There remains a genuine issue, however, as to whether the hospital should have informed Dr. DeQuesada not only of the abnormal bilirubin tests, as they did, but of the infant's failure to void, as they did not. The plaintiff's expert testified that this was the case and that with this additional information, Dr. DeQuesada would have been appropriately alerted to, and could have remedied, the child's distress.
[2] As to the hospital, the record also raises the unresolved issue set out in note 1.
[3] The plaintiffs' experts and Dr. Litt all agree that it was a breach of the standard of care for the treating physician, Dr. Ugalde, to fail to read all of the baby's chart.
[4] In Drackett the plaintiff testified what she would have done if there had been a better warning on the Drano can. The defendant in Drackett did not open the door to that inquiry.
[5] Seley is also distinguishable on its facts. The plaintiff in Seley sued a drug manufacturer alleging strict liability for failure to give proper physician warnings. Under Ohio law plaintiff was entitled to a presumption that a warning, if given, would be followed. See 423 N.E.2d at 838. "However, where no warning is given, or an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug." Id. It is in that light the Seley court said, "`What the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case.'" Id. at 839 (citation omitted). That was true because the plaintiff enjoyed the benefit of the presumption. The issue actually under consideration in Seley was whether the manufacturer had rebutted the presumptionbecause the physician had testified he already knew the health risks. Assuming Seley is correctly decided, it has no application to the present case.