# Supreme Court of Florida

———————

No. SC15-1926

———————

**ALEXIS CANTORE, etc., et al.**,
Petitioners,

vs.

**WEST BOCA MEDICAL CENTER, INC., etc., et al.**,
Respondents.

[April 26, 2018]

PER CURIAM.

Because the treating physician's deposition testimony regarding how he would have treated Alexis Cantore had she arrived at Miami Children's Hospital earlier was inadmissible, we quash the Fourth District Court of Appeal's decision in *Cantore v. West Boca Medical Center, Inc.*, 174 So. 3d 1114 (Fla. 4th DCA 2015).[1]

## BACKGROUND

---

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

In July 2008, Alexis Cantore suffered permanent brain damage while being treated for hydrocephalus at West Boca Medical Center (WBMC) and Miami Children's Hospital (MCH). The Fourth District described the background of this case as follows:

In 2006, two years before the illness that gave rise to this case, when Alexis Cantore was twelve years old, she was diagnosed with hydrocephalus, a condition resulting from a build-up of excess cerebral spinal fluid within the cranium. Her condition resulted from a benign tumor which grew and blocked the outflow of the fluid which normally circulates around the brain. In 2006, she underwent a procedure, known as an Endoscopic Third Ventriculostomy ("ETV"), to remove the blockage. The procedure, which was performed at MCH, relieved the problem without causing Alexis any permanent injury.

However, scar tissue began to develop; a December 2007 CT scan at WBMC showed fluid starting to accumulate around her brain again. MRIs in March and June 2008 confirmed that a blockage was occurring again. A doctor at MCH scheduled Alexis for an ETV on July 28, 2008.

However, on July 3, 2008, at 2:30 p.m., Alexis began experiencing painful headaches and vomiting. Alexis's parents called MCH; a nurse told them to bring Alexis to the nearest hospital for a CT scan if they could not make it to MCH. Alexis was taken by ambulance to WBMC, arriving at 4:29 p.m. She was triaged and, on a three-tiered scale of categories (emergent, urgent and non-urgent), was listed in the middle category as "urgent." "Urgent" patients are those who are sick and require care, but are able to progress. In contrast, "emergent" patients may deteriorate quickly and need interventions, while "non-urgent" patients may have something like a laceration or a bite, which requires care but is not a medical emergency. The triage nurse on duty, in categorizing Alexis as "urgent," noted that she was awake and alert, moving all extremities, had a normal neurological exam, and a normal pupillary response, which was not indicative of an impending brain herniation.

Dr. Freyre-Cubano ("Dr. Freyre"), a pediatrician who was working in the WBMC emergency room, ordered a CT scan STAT at

4:47 p.m., before examining Alexis. Dr. Freyre first evaluated Alexis and noted that she had a normal pupillary exam. A nurse also noted no deficits to Alexis's eyes. Dr. Freyre performed another eye exam which showed that Alexis's pupils were equal and reactive to light. A radiologist read the new CT scan, compared it with the previous one from December 2007, and confirmed in a report that Alexis's condition was worsening, and that the ventricles were larger than they had been on the previous CT scan. The findings were "consistent with worsening hydrocephalus."

By 5:40 p.m., Dr. Freyre had reviewed the report on the CT scan and called Dr. Sandberg, the on-call pediatric neurosurgeon at MCH, regarding transferring Alexis to MCH. At that time, Dr. Freyre told Dr. Sandberg that Alexis was "stable." This became an important issue at trial and . . . on appeal.

Dr. Freyre spoke with MCH's emergency department physicians regarding transferring Alexis via MCH's helicopter transportation service, known as "LifeFlight." About twenty minutes later, the MCH dispatcher for LifeFlight received the request for transport.

A WBMC nurse called the operations administrator at MCH, and apparently learned that the pilots on shift were approaching the maximum twelve hours of flight time and Alexis's transport would be completed by the on-coming pilots. LifeFlight's estimated arrival time was 7:00 p.m.

At 6:22 p.m., Alexis had an episode of vomiting, during which her heart rate briefly dropped to 55. A WBMC nurse then contacted a MCH Pediatric Intensive Care Unit ("PICU") nurse to update them. Dr. Freyre noted that she had called the MCH emergency department physician regarding Alexis's transfer and gave the necessary information.

Alexis was transferred to LifeFlight care at 7:25 p.m. She was examined by a LifeFlight nurse. The neurological assessment at that time was that Alexis was asleep, non-verbal and oriented as to person. When she was awakened, she was able to respond to her mother by nodding her head, and her pupils were equal, round and reactive to light. She had a Glasgow Coma Scale score of 13, with a perfect score being 15. She had a decrease in her speech. The helicopter lifted off at 8:09 p.m.

During the flight, Alexis suffered an acute decompensation. By the time she landed at MCH at 8:25 p.m., she had suffered a brain

herniation. Accordingly, instead of taking Alexis to PICU, hospital personnel took her straight to the ER. Alexis arrived in very critical condition. Dr. Sandberg did an emergent ventriculostomy, in which he drilled a hole into her skull to insert a catheter, thereby relieving pressure on the brain. This procedure saved her life. However, Alexis suffered permanent brain damage; she has significant mental impairment and must be fed through a tube. She will never be able to work or live independently.

*Id.* at 1115-17.

In 2010, Alexis and her parents, Felix and Barbara Cantore, sued WBMC and MCH, alleging that they had not provided proper medical care for Alexis on July 3, 2008. The Cantores presented testimony from several expert witnesses regarding the timing of Alexis' transfer from WBMC to MCH and the care she received from the LifeFlight crew. One of the witnesses, Dr. William Loudon, a pediatric neurosurgeon, testified that, based on his understanding of Alexis' condition before she herniated, if she had come under his care prior to the herniation, he would have performed an emergency ventriculostomy. In Dr. Loudon's opinion, if Alexis had received earlier relief from the build-up of cerebrospinal fluid in her brain, the herniation could have been prevented.

Over the Cantores' objection, counsel for WBMC was permitted to publish to the jury the deposition of Dr. Sandberg, the pediatric neurosurgeon at MCH who operated on Alexis, in which Dr. Sandberg answered hypothetical questions as to how he would have treated Alexis had she arrived at MCH an hour or two earlier. The trial court also permitted Dr. Steven White, WBMC's expert on pediatric

- 4 -

emergency medicine, to testify that Dr. Sandberg's statement as to what he would have done had Alexis arrived at MCH earlier was consistent with what other neurosurgeons would have done.

Ultimately, the jury returned a verdict in favor of WBMC and MCH. The Fourth District affirmed, concluding that this Court's decision in *Saunders v. Dickens*, 151 So. 3d 434 (Fla. 2014), did not prevent the admission of Dr. Sandberg's deposition testimony. *Cantore*, 174 So. 3d at 1117-21.

## ANALYSIS

The Cantores argue that the trial court abused its discretion in admitting Dr. Sandberg's deposition testimony about what he would have done had Alexis arrived at MCH earlier because such testimony is prohibited by this Court's decision in *Saunders*. We agree and quash the Fourth District's decision.[2]

_____

2. We also agree with the Cantores that the trial court erred in entering a directed verdict in favor of WBMC and MCH on the application of section 768.13, Florida Statutes (2008), the Good Samaritan Act, which grants immunity from civil damages to any healthcare provider that provides "emergency services," unless the damages are the result of "reckless disregard." The threshold question in determining the applicability of the Good Samaritan Act is whether the healthcare provider was providing "emergency services" to the patient. But here there was conflicting evidence regarding whether Alexis was "stabilized and [was] capable of receiving medical treatment as a nonemergency patient" at the times relevant to the Cantores' allegations of medical malpractice. § 768.13(2)(b)2.a., Fla. Stat. For example, there was testimony that immediately upon her arrival at WMBC "her level of consciousness began to wax and wane"; however, another witness testified that she was stable "[u]p until the very end of the transport." Therefore, due to the conflicting evidence about Alexis' condition, the question of whether the Good

- 5 -

A trial court's admission of evidence is reviewed for an abuse of discretion. *See Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1265 (Fla. 2014).

The elements of a medical practice claim are: "(1) a duty by the physician, (2) a breach of that duty, and (3) causation." *Saunders*, 151 So. 3d at 441 (citing *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984)). To establish that a physician breached the duty of care owed to the patient, the plaintiff must prove that "the care provided by the physician was not that of a *reasonably prudent physician*." *Id.* As to the element of causation, "Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding*, 445 So. 2d at 1018.

In *Saunders*, this Court addressed a plaintiff's burden of proof in medical malpractice cases. The patient in *Saunders* went to a neurologist complaining of back and leg pain, unsteadiness, cramps in his hands and feet, numbness in his hands, and tingling in his feet. *Saunders*, 151 So. 3d at 436. The neurologist determined that the issues with the patient's hands were caused by peripheral neuropathy due to diabetes, but the neurologist did not perform a test to confirm the diagnosis. *Id.* The neurologist recommended that the patient be admitted to the hospital, and he ordered an MRI of the patient's brain and lumbar spine. *Id.*

Samaritan Act applied should have been left to the jury. *See Univ. of Fla. Bd. of Trs. v. Stone ex rel. Stone*, 92 So. 3d 264, 271 (Fla. 1st DCA 2012).

"[T]he MRI of the lumbar spine demonstrated severe stenosis (narrowing) of the spinal canal." *Id.* Based on these results, the neurologist referred the patient to a neurosurgeon for a consultation. *Id.* Unaware of any issues with the patient's upper extremities, the neurosurgeon performed a lumbar decompression procedure on the patient. *Id.* The patient's condition did not improve, so the neurosurgeon ordered additional MRIs, including a cervical MRI, which showed compression in both the lower back and neck. *Id.* The neurosurgeon recommended that cervical decompression surgery be performed, but the neurosurgeon did not schedule the surgery as planned. *Id.* A second neurosurgeon met with the patient and concluded that he "should undergo a second lumbar surgery and, at a later date, a cervical spine surgery." *Id.* at 437. "The [second] neurosurgeon performed the lumbar surgery, but the cervical spine surgery was never performed." *Id.* The patient's condition eventually degenerated into quadriplegia. *Id.*

In his medical malpractice claim against the neurologist, the patient in *Saunders* alleged that the neurologist had failed to timely diagnose his cervical compression. *Id.* The patient also filed a claim against the first neurosurgeon, but the parties settled before trial. *Id.* At trial, the patient presented expert testimony that the neurologist's failure to consider cervical cord compression as the cause of the patient's upper body symptoms was a breach of the standard of care. *Id.* The patient also presented expert testimony that, had a cervical decompression surgery

- 7 -

been performed shortly after the time the patient first reported his symptoms, the patient "more likely than not would *not* have progressed to quadriplegia." *Id.* In rebuttal, the neurologist introduced depositions of the first neurosurgeon, which were taken before he settled with the patient. *Id.* at 438. In the depositions, the first neurosurgeon stated that, even if he had possessed the results of a cervical MRI when he initially met with the patient, "he would not have operated on the neck because [the patient] had not yet experienced problems with his upper extremities." *Id.* During closing argument, counsel for the neurologist "asserted that [the patient] had not established causation in light of [the first neurosurgeon's] testimony that he would not have changed the course of treatment even if [the neurologist] had ordered a cervical MRI." *Id.* at 439. The jury then returned a verdict in favor of the neurologist. *Id.*

However, this Court in *Saunders* stated, "[W]e hold that testimony that a subsequent treating physician would not have treated the patient plaintiff differently had the defendant physician acted within the applicable standard of care is irrelevant and inadmissible and will not insulate a defendant physician from liability for his or her own negligence." *Id.* at 443.[3] We explained:

---

3. The dissent contends that we cannot base conflict jurisdiction on this statement because it is allegedly dicta rather than an issue of law this Court actually decided in *Saunders*. However, within the four corners of the *Saunders*

- 8 -

Because the central concern in medical malpractice actions is the reasonably prudent physician standard, the issue of whether a treating physician acted in a reasonably prudent manner must be determined for *each* individual physician who is a defendant in a medical malpractice action. A subsequent treating physician simply may not be present at the time a defendant physician makes an allegedly negligent decision or engages in a potentially negligent act. Further, it is not only the final physician, but rather each treating physician who must act in a reasonably prudent manner. . . . To [allow testimony from a subsequent treating physician like that of the first neurosurgeon], would alter the long-established reasonably prudent physician standard where the specific conduct of an individual doctor in a specific circumstance is evaluated. It would place a burden on the plaintiff to somehow prove causation by demonstrating that a subsequent treating physician would not have disregarded the correct diagnosis or testing, contrary to his or her testimony and irrespective of the standard of care for the defendant physician. To require the plaintiff to establish a negative inappropriately adds a burden of proof that simply is not required under the negligence law of this State.

*Id.* at 442. Accordingly, this Court held that the closing argument by counsel for the neurologist regarding the element of causation was "a misstatement of the law," and "the trial court erred when it permitted . . . counsel to mislead the jury during closing statements." *Id.* We also determined that the error was harmful because counsel for the neurologist "repeatedly relied on [the first neurosurgeon's] testimony in his improper burden-shifting statements" and, because the plaintiff was unable to explain that the first neurosurgeon's deposition was taken before he

---

decision, the majority of this Court expressly indicated that it was deciding this question of law, which is binding precedent.

settled out of the case, "the jury was unaware that [the first neurosurgeon] was motivated by a desire to deny wrongdoing and avoid liability." *Id.* at 442-43.

In this case, Dr. Sandberg's deposition testimony in response to the hypotheticals from all the parties can be summarized as follows: Regardless of whether Alexis had arrived at MCH an hour or two earlier, at some point he would have performed an emergency ventriculostomy to save her life, and she still would have suffered permanent brain damage. Dr. Sandberg explained that this would have been the result regardless of the condition Alexis was in when she arrived. If Alexis had arrived earlier and had been in stable condition, Dr. Sandberg would have scheduled a surgery for later in the day, but Alexis likely would have deteriorated prior to the scheduled surgery, requiring the same type of emergency intervention she actually received. And if Alexis had arrived earlier and was in a deteriorated state (as the Cantores posited would have been the case), Dr. Sandberg would have proceeded with the emergency procedure at that time, just as he actually did several hours later.

The substance of Dr. Sandberg's testimony about how he would have treated Alexis under circumstances other than those that actually occurred is no different from the testimony from the subsequent treating physician in *Saunders*. In the parties' hypotheticals, Dr. Sandberg was not asked to explain the standard of professional care for transferring patients with hydrocephalus who exhibit

- 10 -

symptoms like the ones Alexis was exhibiting. Nor was he asked his opinion about whether any of the other healthcare providers involved in Alexis' care on July 3, 2008, failed to meet that standard. In the context of the entire trial record, it is clear that the purpose of introducing the challenged portions of Dr. Sandberg's deposition testimony was to break the chain of causation between the alleged negligent conduct of WBMC or MCH, or both, and Alexis' injuries—i.e., to establish that Alexis still would have suffered permanent brain damage even if the hospitals and their staffs had effectuated a faster transfer from WBMC to MCH.[4] Therefore, Dr. Sandberg's testimony on that point was "irrelevant and inadmissible," *Saunders*, 151 So. 3d at 443, and the trial court abused its discretion in allowing it to be read to the jury.

Contrary to the dissent's attempt to factually distinguish this case from *Saunders,* nothing in the four corners of *Saunders* provides that the admissibility of a subsequent treating physician's testimony about the causation element is affected by the subsequent treating physician also serving as an advisor to an initial treating physician or being referred to as a neutral and "hybrid" expert witness. Instead, in

---

4. The Fourth District stated that Dr. Sandberg's responses regarding the timing of Alexis' transfer "had bearing on his own actions as well," and in them "he was explaining *his* medical decision-making process and how different decisions made by *him* would have impacted Alexis's neurological status and condition." *Cantore*, 174 So. 3d at 1119. However, the Cantores never alleged that Dr. Sandberg or any other provider acted negligently *after* Alexis arrived at MCH.

- 11 -

*Saunders*, this Court's focus was on the substance of the subsequent treating physician's testimony and its effect on the plaintiff's case. Similarly, here, the pertinent hypotheticals at issue concerned Dr. Sandberg's status as the subsequent treating physician and how his own subsequent treatment might have changed if any previous treating healthcare providers had acted differently (i.e., arranged a faster transfer).

Additionally, the error here was not harmless. *See* § 59.041, Fla. Stat. (providing that the harmless error test applies to the "improper admission or rejection of evidence"); *Saunders*, 151 So. 3d at 442 (applying the harmless error test under these circumstances). "To test for harmless error [in civil appeals], the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict." *Special*, 160 So. 3d at 1256.

Here, the Fourth District correctly pointed out that the Cantores were not "hindered or restricted" in expressing their theory of liability against WBMC and MCH. *Cantore*, 174 So. 3d at 1121. Indeed, the Cantores presented multiple witnesses who testified that the actions of WBMC (including Dr. Freyre) and MCH fell below the applicable standard of care, causing Alexis to suffer permanent brain damage. However, counsel for WBMC and MCH relied on Dr. Sandberg's

responses to the hypothetical questions to argue to the jury that the Cantores failed to meet their "promise" to show that the outcome in this case would have been different had Alexis arrived at MCH earlier than she did. In making this argument, counsel for WBMC and MCH each read directly from Dr. Sandberg's deposition, highlighting the erroneously admitted portions of his testimony. In *Saunders*, this Court expressly disapproved of this type of burden-shifting argument regarding the causation element of a medical malpractice claim. *See* 151 So. 3d at 442. But for the erroneous admission of Dr. Sandberg's deposition testimony, counsel could not have made such an argument and put the Cantores in the position of needing to prove that Dr. Sandberg's testimony was false. Furthermore, the record reflects that during deliberations the jury twice asked to review Dr. Sandberg's deposition testimony. After a five-week long trial with 42 witnesses, this was one of only two witnesses the jury asked to hear from again. Finally, as the Cantores point out, Dr. Sandberg's testimony about how he would have treated Alexis if she had arrived at MCH earlier was bolstered by Dr. White's testimony that Dr. Sandberg's responses were "consistent" with his own experience with emergency ventriculostomies.

Accordingly, the erroneous admission of Dr. Sandberg's testimony was not harmless.[5]

## CONCLUSION

For the foregoing reasons, Dr. Sandberg's testimony about how he would have treated Alexis had she arrived at MCH earlier was inadmissible and cannot be considered harmless error. Accordingly, we quash the Fourth District's decision in *Cantore*, reverse the judgment in favor of WBMC and MCH, and remand for a new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and POLSTON, JJ., concur.
POLSTON, J., concurs with an opinion.
CANADY, J., dissents with an opinion, in which LAWSON, J., concurs.
LEWIS, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

POLSTON, J., concurring.

Although I believe there is jurisdiction as expressed in the majority opinion, I share Justice Canady's concern regarding the breadth of this Court's holding in

---

5. Because it was not preserved at trial, we do not address the Cantores' argument regarding the issue of agency and the inclusion of Dr. Freyre's name on the verdict form.

*Saunders v. Dickens*, 151 So. 3d 434 (Fla. 2014). However, no argument to recede from the holding in *Saunders* was raised here.

CANADY, J., dissenting.

The Fourth District's decision in *Cantore v. West Boca Medical Center, Inc.*, 174 So. 3d 1114 (Fla. 4th DCA 2015), does not expressly and directly conflict with this Court's decision in *Saunders v. Dickens*, 151 So. 3d 434 (Fla. 2014), "on the same question of law." Art. V, § 3(b)(3), Fla. Const. Because this Court lacks jurisdiction to review *Cantore*, I dissent.

My disagreement with the majority's determination of jurisdiction is twofold. First, *Cantore* and *Saunders* involve entirely different questions of law regarding medical malpractice actions. *Cantore* involves the admissibility of certain deposition testimony from a "subsequent" treating physician. In *Saunders*, this Court's majority couched its holding, in part, in terms of the relevance and admissibility of the subsequent treating physician's deposition testimony, but that language in *Saunders* is mere dicta. The actual question of law in *Saunders* involved not whether the testimony was admissible but rather whether the testimony could be given conclusive effect regarding the element of causation. Second, even if *Saunders* can properly be read to involve the issue of admissibility, jurisdiction is still lacking because *Cantore* and *Saunders* do not involve substantially similar controlling facts. Among other things, the nature of the

testimony at issue in *Cantore* is significantly different from the specific type of testimony proscribed by *Saunders*.

## The Actual Question of Law in *Saunders*

This Court's majority in *Saunders* chose to couch its holding, in part, in terms of the relevance and admissibility of the deposition testimony. *Saunders*, 151 So. 3d at 443. Here, the majority's determination of jurisdiction rests squarely on the admissibility aspect of the "holding" in *Saunders*. *See* majority op. at 1 (quashing the Fourth District's decision "[b]ecause the treating physician's deposition testimony . . . was inadmissible"). But *Saunders'* reference to relevance and admissibility cannot properly form the basis for jurisdiction. That reference is not only dicta, but it purports to constitute a holding on an issue of law that was never even presented to this Court.

In *Saunders*, the original treating physician (a neurologist) was the only remaining defendant in the case at the time of trial. *Saunders*, 151 So. 3d at 436, 437. All of the other named defendants, including the subsequent treating physician (a neurosurgeon), settled with the plaintiffs prior to trial. *Id.* at 437. The subsequent treating physician was, however, later included as a *Fabre*[6] defendant on the verdict form. *Id.* During the subsequent treating physician's deposition,

---

6. *Fabre v. Marin*, 623 So. 2d 1182 (Fla. 1993).

which was taken prior to his reaching a settlement with the plaintiffs, the subsequent treating physician testified that he would not have done things differently even if the original treating physician had ordered a cervical MRI (which likely would have revealed the patient's cervical compression). *Id.* at 438. At trial, the defendant (the original treating physician) introduced the deposition testimony of the subsequent treating physician, and defense counsel argued to the jury during closing statements that given the deposition testimony, the plaintiffs could not prove the requisite element of causation. *Id.* Plaintiffs' counsel objected to defense counsel's closing argument "on the basis that this was a misstatement of the law," but the trial court overruled the objection. *Id.* at 438-39. The jury returned a verdict in favor of the defendant physician. *Id.* at 439. On appeal, the Fourth District framed the issue regarding defense counsel's closing argument as one involving the burden of proof. Namely, the Fourth District "held that" the closing argument "was not improper" and that defense counsel "did not improperly shift the burden of proof." *Id.* There is nothing to indicate that the separate issue of the admissibility of the deposition testimony was in any way presented to the Fourth District.

On review of the Fourth District's decision, this Court in *Saunders* similarly framed the legal issue presented as one involving "the burden of proof in negligence actions." *Id.* at 440. *Saunders* concluded that defense counsel

misleadingly misstated the law during closing statements when he claimed that the subsequent treating physician's deposition testimony rendered it impossible for the jury to conclude that any negligence by the defendant physician caused the injury. *Id.* at 442. *Saunders* then determined that the trial court committed harmful error by allowing defense counsel to mislead the jury, for the following two reasons: (1) defense counsel "repeatedly relied on [the deposition] testimony in his improper burden-shifting statements," and (2) the jury was not permitted to hear that the deposition was taken while the subsequent treating physician "was in an adversarial relationship with" the plaintiffs. *Id.* at 442-43. Without providing any framework for doing so, the majority in *Saunders* couched its holding, in part, in terms of the relevance and admissibility of the deposition testimony: "we hold that testimony that a subsequent treating physician would not have treated the patient plaintiff differently had the defendant physician acted within the applicable standard of care *is irrelevant and inadmissible* and will not insulate a defendant physician from liability for his or her own negligence." *Id.* at 443 (emphasis added). There is nothing to indicate that the issue of admissibility was in any way presented to this Court. None of the analysis in *Saunders* addresses the issue of admissibility.

Lacking any foundation in the Court's analysis, the language in *Saunders* regarding relevance and admissibility simply pops up from nowhere in the

conclusion of the opinion. It is wholly unnecessary to the resolution of the case and is thus mere dicta. Under article V, section 3(b)(3) of the Florida Constitution, express and direct conflict cannot be established based on a purported conflict with a sua sponte statement from this Court—whether couched as a holding or otherwise—regarding some future issue that was never presented or analyzed in the case. Rather, that constitutional requirement must be grounded in a decision concerning an issue actually presented and considered by the Court. And in *Saunders*, the only "question of law" that was actually "deci[ded]" involved the burden of proof and whether certain testimony could be given conclusive effect regarding the element of causation. *See* art. V, § 3(b)(3), Fla. Const.

To further illustrate how untethered the issue of admissibility was to the decision in *Saunders*, one need only look to the other three cases examined by this Court's majority in *Saunders*—namely, *Ewing v. Sellinger*, 758 So. 2d 1196 (Fla. 4th DCA 2000), and the two conflict cases of *Goolsby v. Qazi*, 847 So. 2d 1001 (Fla. 5th DCA 2003), and *Munoz v. South Miami Hospital, Inc.*, 764 So. 2d 854 (Fla. 3d DCA 2000). Not one of those three cases turned on the issue of admissibility. Rather, those cases involved whether certain what-if testimony—or the absence of such testimony—was dispositive regarding the element of causation.

In *Munoz*, the issue was whether summary judgment was properly granted in favor of certain defendants based on testimony from one of the defendant physicians regarding "what he would or would not have done in response to warnings which should have been but were never in fact given." *Munoz*, 764 So. 2d at 856. In *Goolsby*, the issue was whether a directed verdict was properly granted in favor of a defendant physician based on the absence of evidence showing that any of the other physicians involved would have done anything differently even if the x-rays had been properly read. *Goolsby*, 847 So. 2d at 1002-03. And in *Ewing*, the issue was whether a directed verdict was properly granted in favor of the defendant physician based on testimony from the subsequent treating physician that he would not have done anything differently even if the defendant physician had performed a risk evaluation. *Ewing*, 758 So. 2d at 1196-97. These three district court cases all involve the conclusive effect of testimony as opposed to the admissibility of that testimony. And this Court's majority in *Saunders*, 151 So. 3d at 443, unequivocally approved the conflict case of *Munoz*, in which the Third District specifically noted that, although the what-if statements at issue "surely cannot be given conclusive effect" to warrant summary judgment, the statements were indeed *admissible*, *Munoz*, 764 So. 2d at 856.

The entire context of *Saunders* and the district court cases examined by *Saunders* makes clear that the question of law decided in *Saunders* involved

causation and the burden of proof, not admissibility. The actual holding of *Saunders* is thus that testimony by a subsequent treating physician regarding what he or she would have done cannot be given conclusive effect regarding the element of causation. Although such testimony may create an inference of no causation, ultimately the case cannot be decided as a matter of law based on what a particular physician would have done as opposed to what a hypothetical physician operating under the professional standard of care would have done.

In short, because the decisions in *Saunders* and *Cantore* involve entirely different questions of law, this Court does not have jurisdiction to review *Cantore*.

**The Differing Factual Nature of *Saunders* and *Cantore***

Even assuming that *Saunders* can properly be read to involve the issue of admissibility, conflict jurisdiction still does not exist. Although *Saunders* and *Cantore* both involve a "subsequent" treating physician's testimony, they do so in very different factual contexts, and the nature of the deposition testimony in *Cantore* is not the specific type of testimony proscribed by *Saunders*. Because the two cases do not "involve[e] substantially the same facts," this Court does not have jurisdiction. *Nielsen v. City of Sarasota*, 117 So. 2d 731, 735 (Fla. 1960).

As an initial matter, *Cantore* is distinguishable from *Saunders* based on the underlying nature of the subsequent treating physicians in the two cases. For example, unlike *Saunders*—in which, unbeknownst to the jury, the subsequent

treating physician had been an active defendant at the time of his deposition—the district court in *Cantore* described the subsequent treating physician as being "at all times a neutral third-party witness with no motivation to deny wrongdoing or avoid liability as he was never a defendant, unlike the testifying neurosurgeon in *Saunders*." *Cantore*, 174 So. 3d at 1121.[7] Additionally, in *Cantore*, the district court made clear that the subsequent treating physician was also intimately involved in and "played such an influential role in the care at issue:" the original treating physician and other medical personnel at the original treating physician's hospital "continually followed [the subsequent treating physician's] instructions, heeded his recommendations, and noted his preferences." *Id.* at 1119. This "hybrid" role, *id.*, played by the subsequent treating physician is significantly different than that in *Saunders*. Finally, unlike *Saunders*, the district court in *Cantore* repeatedly referred to the subsequent treating physician as an "expert" witness. *See id.* at 1115, 1119, 1120. *Saunders* itself recognized that medical malpractice actions "often involve" expert witnesses testifying to hypotheticals involving "what a reasonably prudent physician would have done *and the effect*

_____

7. At the time of trial in *Cantore*, two defendants remained—(1) the hospital at which the original treating physician provided care, and (2) the hospital that provided the helicopter transportation service and at which the subsequent treating physician performed the emergency ventriculostomy that saved the child's life. *Cantore*, 174 So. 3d at 1115-17, 1121.

*that such reasonable care would have had* on the patient." *Saunders*, 151 So. 3d at 442 (emphasis added). And that is exactly how the district court portrayed the subsequent treating physician in *Cantore*—as an expert witness testifying regarding hypotheticals. The majority here ignores the differences between the subsequent treating physicians in *Saunders* and *Cantore*.

*Cantore* is also distinguishable from *Saunders* based on the underlying nature of the deposition testimony in the two cases. In *Saunders*, this Court's majority proscribed (in dicta) certain specific testimony from a subsequent treating physician—namely, testimony "that adequate care by the defendant physician would not have altered the subsequent care." *Saunders*, 151 So. 3d at 442. That proscribed testimony is missing here. In *Cantore*, the "true condition" of the child while under the physical care of the original treating physician was very much in dispute at trial and was the critical factual issue for the jury to decide. As the district court noted, the original treating physician's "action (or inaction) was the focus of the entire five-week trial," *Cantore*, 174 So. 3d at 1121, and the plaintiffs' "strategy during the course of the litigation and at trial was to demonstrate that [the original treating physician] failed to appreciate [the child's] true condition and as a result provided inaccurate information to multiple healthcare providers at [Miami Children's Hospital], including, but not limited to, [the subsequent treating physician]," *id.* at 1120. What is clear from the district court's opinion is that the

subsequent treating physician's deposition testimony regarding the likelihood of the same end result was based *only* on the underlying assumption that the child was "alert and oriented," as opposed to deteriorating neurologically. *Id.* at 1117. And that underlying assumption "was based on his understanding of [the child's] condition at that time." *Id.* at 1119. In fact, the district court specifically noted that the subsequent treating physician testified "that *he would have made different recommendations* to intubate and administer diuretics had he been told" that the child's condition was as the plaintiffs suggested—that is, deteriorating neurologically. *Id.* at 1120. In other words, the subsequent treating physician testified that he would have treated the child *differently* under the competing factual scenarios. The gist of his "expert" testimony thus was that the child's "true condition" was the "key point" that would have determined "the timing of intervention." *Id.* And he explained why, assuming that the child was in fact awake and oriented, it would not have mattered if the child had come under his physical care two hours earlier than she did. *Id.* at 1117. Nothing within the four corners of the *Cantore* opinion supports the conclusion that the subsequent treating physician testified that he would not have treated the child differently—and that the end result would have inevitably been the same—even if the child's "true condition" was as asserted by the plaintiffs at trial. The nature of the deposition testimony in *Cantore*—as described by the district court within the four corners of

- 24 -

its opinion—is dramatically different than that in *Saunders*, in which the original treating physician did not correctly diagnose the patient, and in which the subsequent treating physician testified that a correct diagnosis would nevertheless not have affected the subsequent treatment of the patient.

**Conclusion**

The majority improperly bases its determination of jurisdiction in this case on its "disagreement with the result reached by a district court applying" *Saunders*, as opposed to on express and direct conflict with *Saunders*. *Dorsey v. Reider*, 139 So. 3d 860, 867 (Fla. 2014) (Canady, J., dissenting). Because *Saunders* and *Cantore* involve entirely different questions of law, and because the controlling facts in the two cases are not substantially similar, this Court does not have jurisdiction in this case. Accordingly, I dissent.

LAWSON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

    Fourth District - Case No. 4D13-1985

    (Palm Beach County)

Philip M. Burlington and Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, Florida; Scott Schlesinger and Linda A. Alley of Schlesinger Law Offices, P.A., Fort Lauderdale, Florida,

    for Petitioner

Bruce M. Ramsey and Donna Krusbe of Billing, Cochran, Lyles, Mauro &

Ramsey, P.A., West Palm Beach, Florida; Elliot H. Scherker, Julissa Rodriguez, and Stephanie L. Varela of Greenberg Traurig, P.A., Miami, Florida; Scott Solomon and Norman Waas of Falk, Waas, Hernandez, Cortina, Solomon & Bonner, P.A., Coral Gables, Florida,

for Respondent