# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____


WILLIAM BLACKSHEAR, M.D., and
WILLIAM M. BLACKSHEAR, JR., M.D., P.A.,

Appellants,

v.

BETTY JEAN HAYNES,

Appellee.


No. 2D2024-0011

_____


December 31, 2025


BY ORDER OF THE COURT:

Upon consideration of appellee's motion for rehearing filed on October 10, 2025,

IT IS ORDERED that the motion for rehearing is denied. The opinion dated September 26, 2025, is withdrawn and the attached opinion is substituted for clarification.

No further motion for rehearing will be entertained in this appeal.


I HEREBY CERTIFY THE FOREGOING IS A
TRUE COPY OF THE ORIGINAL COURT ORDER.

MARY ELIZABETH KUENZEL
CLERK

DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____


WILLIAM BLACKSHEAR, M.D., and
WILLIAM M. BLACKSHEAR, JR., M.D., P.A.,

Appellants,

v.

BETTY JEAN HAYNES,

Appellee.


No. 2D2024-0011

_____

December 31, 2025

Appeal from the Circuit Court for Pinellas County; William Douglas
Baird, Senior Judge.

Garrett A. Tozier of Shutts & Bowen LLP, Tampa, for Appellants.

Brandon K. Breslow, Kristin A. Norse, and Stuart C. Markman, of
Counsel, of Kynes, Markman & Felman, P.A., Tampa, for Appellee.

SMITH, Judge.

William Blackshear, M.D., and his medical practice (collectively
Blackshear) seek a new trial after a jury found that Dr. Blackshear
committed medical negligence and ordered unnecessary diagnostic tests,
causing $175,000 in damages to Betty Haynes. Blackshear raises four
issues on appeal challenging several rulings made by the trial court
regarding evidentiary objections and motions for directed verdict. We

find one issue raised by Blackshear meritorious and dispositive. Because the trial court allowed an expert nephrologist not of the "same specialty" as vascular surgeon Dr. Blackshear to testify and provide standard of care opinions from the "standpoint" of a nephrologist, we reverse and remand for a new trial on counts one and four.

I.

In early 2010, Ms. Haynes' primary care physician referred her to Dr. Blackshear to treat a bruit (a "whooshing" sound possibly caused by narrowing or obstruction) in her carotid artery.

Dr. Blackshear first saw Ms. Haynes in the beginning of 2010, and he thereafter ordered a series of tests and procedures to correct what Dr. Blackshear believed to be stenosis of the right carotid artery caused by fibromuscular dysplasia (FMD) in the renal arteries. Over the course of several months, the following tests and procedures were performed on Ms. Haynes: ultrasound of the carotids; computed tomography angiography (CTA) with contrast dye on January 29, 2010, that showed stenosis of the right carotid suggestive of FMD; carotid arteriogram (in which contrast dye is injected to an artery to observe blood flow) on February 15, which found stenosis of the right carotid artery with an appearance suggesting FMD; and a renal vein renin assay procedure on March 10, which indicated FMD in both kidneys.

On April 13, 2010, Dr. Blackshear and Ms. Haynes discussed the results of the March 10 renal vein renin assay procedure and moving forward with an angioplasty on the right artery with an examination of the left artery. Dr. Blackshear testified that high renin levels would indicate possible FMD in the renal artery. The angioplasty proceeded on April 28, 2010, after arteriograms confirmed the presence of FMD (or stenosis typical of FMD) in both renal arteries. A stent was placed in the

2

right main renal artery area. Dr. Blackshear noted excellent blood flow in both renal arteries following the procedure.

Hours after the angioplasty, Dr. Blackshear was called back to the hospital due to Ms. Haynes' complaints of back pain. Dr. Blackshear ordered a blood transfusion and CTA upon learning that Ms. Haynes' blood pressure was low. The CTA indicated that there was blood near the left kidney; an arteriogram was then performed to determine the source of the bleeding. During the arteriogram, Dr. Blackshear and the radiologist removed a thrombosis (clot) that was found in Ms. Haynes' left renal artery. Dr. Blackshear and the radiologist reported that Ms. Haynes' right renal artery was patent (unobstructed). That determination was made despite the finding of no definite blood flow in the right renal artery, as a blockage was believed to be an artifact (a distortion of the image) caused by the stent or the timing of the imaging. Dr. Blackshear continued to treat Ms. Haynes following the angioplasty and recommended a Doppler ultrasound to measure the blood flow in her renal arteries. Ms. Haynes rescheduled and canceled the Doppler ultrasound and appointments with Dr. Blackshear over the next several months.

In December 2010, Ms. Haynes had the Doppler ultrasound with her new nephrologist, which showed her right kidney lacked blood flow and had atrophied to nearly half the size of her left.

In 2012, Ms. Haynes sued Blackshear for, among other things, medical negligence (count one) due to the damage to her right kidney and for ordering and administering unnecessary diagnostic tests—specifically the February 15 carotid arteriogram test and March 10 renal vein renin assay—in violation of section 766.111, Florida Statutes (2010) (count four).

3

At trial, Ms. Haynes presented expert testimony from vascular surgeon Dr. Timothy Harward, who testified that the February 15 carotid arteriogram was unnecessary because Dr. Blackshear had "already made his diagnosis" from the earlier CTA, which indicated FMD. Dr. Harward also opined that the March 10 renal vein renin assay was unnecessary because tests indicated that Ms. Haynes' kidney function was normal and her blood pressure was being controlled with medication. He stated that patients with "essential hypertension," or benign high blood pressure, produce renin as do patients with renovascular hypertension. Dr. Harward testified that the renal renin assay would not help a doctor "make a decision. It's not going to help me treat Ms. Haynes. It's not going to direct me to do something else. I can't make it any better than it already is." He also stated that essential hypertension could not be treated with surgery and that, thus, there was no benefit to conducting the April 28 angioplasty.

Ms. Haynes also presented expert testimony from nephrologist Dr. Harold Helderman, who provided testimony as to both the alleged medically unnecessary tests and medical negligence counts. Dr. Blackshear objected to Dr. Helderman's opinion testimony, given from a nephrologist point of view, arguing that under Florida's "same specialty" requirement, Dr. Helderman was not qualified to give an opinion on the standard of care for a vascular surgeon. Ms. Haynes argued that Dr. Helderman would not testify regarding the standard of care but that his opinion was relevant to the medical necessity of the February 15 and March 10 tests "as a nephrologist from a different standpoint than a vascular surgeon." While Blackshear had no objection to Dr. Helderman testifying to the definition of essential hypertension, it objected to the remainder of the testimony because Dr. Helderman was not a vascular

4

surgeon. Ms. Haynes successfully couched her arguments to the trial court that Dr. Helderman's testimony was not about "doing the surgery" but rather "evaluating for the surgery," which she argued was within a nephrologist's purview. In other words, the argument made was that Dr. Helderman should be permitted to testify regarding whether Dr. Blackshear should have consulted a nephrologist on the medical necessity of the tests ordered, which is not related to standard of care. Blackshear again objected, arguing that allowing Dr. Helderman to testify from the standpoint of a nephrologist would in essence be "backdooring standard of care [testimony]."

In the end, the trial court allowed the jury to hear Dr. Helderman's testimony. In clarifying the trial court's ruling, Blackshear asked whether Dr. Helderman would be permitted to testify to whether Dr. Blackshear "deviated from the standard of care," and the court stated, "From a nephrologist standpoint, yes." Blackshear then asked if it had to renew its objection "on every standard of care question," and the trial court responded, "Presume this will be a standing objection to anything that even hints of a standard of care."

Dr. Helderman took the witness stand and testified that because Ms. Haynes had essential hypertension with no additional symptoms indicating that surgery was necessary, he "would not have referred Ms. Haynes for invasive testing or evaluation" as the testing was not clinically indicated; he said Ms. Haynes' issue was not one that needed to be repaired by a surgeon. In response to Dr. Blackshear's prior deposition testimony that he ordered the invasive renal test based on three of Ms. Haynes' high blood pressure readings, Dr. Helderman testified that he would not have ordered invasive testing based on those measurements and would not order invasive testing where a patient such as Ms. Haynes

5

was not taking more than three drugs to control her hypertension and did not have an increase in serum creatine hypertension (which would indicate renovascular hypertension that might require invasive procedures). Dr. Helderman said that when a patient is taking an ACE (angiotensin-converting enzyme) inhibitor and a diuretic and has fasted hours before the test as Ms. Haynes had, renin levels increase and the renal test becomes "uninterpretable." He attested this was part of the reason that renal vein renin assays had largely been "abandoned." Dr. Helderman then testified that based on the results of renin test, he also would not have ordered the invasive angiogram or balloon angioplasty because the procedures were "medically unnecessary"; he expressed his opinion by saying he would not have taken the course of action taken by Dr. Blackshear "[a]s a nephrologist."

Dr. Helderman's testimony was offered to support the argument that Blackshear should have referred Ms. Haynes to a nephrologist to be evaluated for her hypertension. Blackshear argues that this issue was unpled and not tried by consent, contrary to Ms. Haynes' claims, where Dr. Blackshear was granted a continuing objection by the trial court on standard of care opinions.

At the conclusion of Dr. Helderman's testimony, Blackshear moved for a mistrial, renewing its objection that Dr. Helderman's testimony improperly related to the standard of care for a vascular surgeon. The trial court denied the motion.

Blackshear presented expert testimony in its case-in-chief from a vascular surgeon and a radiologist who opined that all the tests ordered were necessary to help him diagnose and treat FMD.

The jury returned a verdict for Ms. Haynes on both counts one and four awarding $175,000 in damages. Blackshear renewed its motion for

new trial, which the trial court denied.

II.

Blackshear argues that the trial court allowed Dr. Helderman, a nephrologist, to provide inadmissible testimony on the standard of care for a vascular surgeon.

"A trial court's decision to accept or reject expert testimony is reviewed for an abuse of discretion." *743 Mahoney, LLC v. MDC 5, LLC*, 204 So. 3d 116, 117 (Fla. 2d DCA 2016) (citing *Eagle's Crest, LLC v. Republic Bank*, 42 So. 3d 848, 850 (Fla. 2d DCA 2010)).

In an action under chapter 766, an expert witness may not testify to the professional standard of care against a specialist unless that expert witness "[s]pecialize[s] in the same specialty as the health care provider against whom or on whose behalf the testimony is offered." § 766.102(5)(a)1. While "same specialty" is not defined, "Florida courts have previously decided that 'same specialty' is to be taken literally and is not synonymous with physicians with different specialties providing similar treatment to the same areas of the body." *Riggenbach v. Rhodes*, 267 So. 3d 551, 555 (Fla. 5th DCA 2019), *disapproved on other grounds by Univ. of Fla. Bd. of Trs. v. Carmody*, 372 So. 3d 246 (Fla. 2023). Ms. Haynes concedes that Dr. Helderman does not specialize in the same specialty as Dr. Blackshear but argues that Dr. Helderman did not testify regarding the professional standard of care for a vascular surgeon. We disagree.

Medical negligence requires establishing "(1) a duty by the physician, (2) a breach of that duty, and (3) causation." *Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014). "The duty element requires a physician to act within the standard of professional care," which is "the care that a reasonably prudent physician would provide." *Id.*;

7

§ 766.102(1). To establish that a physician breached the professional standard of care in performing a "diagnostic procedure," a plaintiff must show that a claimed injury resulting from the procedure was not of the type "within the necessary or reasonably foreseeable results of" that procedure when carried out "by a reasonably prudent similar health care provider." § 766.102(2)(a). Additionally, section 766.111(1) bars a health care provider from ordering or performing diagnostic tests "not reasonably calculated to assist the health care provider in arriving at a diagnosis and treatment of a patient's condition." Whether testing is unnecessary depends on the standard of care applicable to a given situation. *Cf. Jackson v. United States*, 469 F. Supp. 2d 1068, 1082 (M.D. Fla. 2006) (stating that "[a] claim for an unnecessary procedure or surgery is cognizable under Florida law" but "[i]f . . . the performance of the procedure at issue is customary in situations like that presented by the patient, the decision to perform the procedure does not violate the standard of care" (citing *Bush v. United States*, 703 F.2d 491, 496 (11th Cir. 1983))).

In *Riggenbach*, the plaintiff sued Dr. Riggenbach, an orthopedic surgeon, for medical negligence after he suffered permanent damage following wrist surgery. 267 So. 3d at 552-53. Instead of providing a written expert report from an orthopedic surgeon with his presuit notice of intent to initiate litigation under section 766.106(4), the plaintiff submitted a report from a board certified plastic surgeon and otolaryngologist. *Id.* at 553. After Dr. Riggenbach moved to dismiss the plaintiff's complaint, the trial court denied the motion and Dr. Riggenbach petitioned for certiorari review. *Id.* The Fifth District recognized that while physicians of different specialties may in fact treat the same body parts and perform similar procedures, in the end the

"doctors have different training and practice in different specialties." *Id.* at 555 (quoting *Clare v. Lynch*, 220 So. 3d 1258, 1260-61 (Fla. 2d DCA 2017) (holding that the trial court departed from the essential requirements of the law by allowing a presuit affidavit from a podiatrist to support the medical negligence claim against an orthopedic surgeon), *disapproved on other grounds by Carmody*, 372 So. 3d 246); *see also Myers v. Pasco Cnty. Sch. Bd.*, 246 So. 3d 1278, 1279 (Fla. 1st DCA 2018) (granting the petition for certiorari and quashing the judge of compensation claims' decision that found that because a neurosurgeon and orthopedic surgeon both treated back injuries they were in the same specialty). Accordingly, the district court granted Dr. Riggenbach's petition and quashed the trial court's order below. *Id.* at 556. In this case, as in *Riggenbach*, *Clare*, and *Myers*, the trial court overlooked a threshold issue that Dr. Blackshear and Dr. Helderman have different specialty backgrounds, instead erroneously considering the similar procedures each performs.

With respect to medical negligence in count one, Ms. Haynes argues that Dr. Helderman offered no standard of care opinions for a vascular surgeon. Notwithstanding, in her Answer Brief Ms. Haynes acknowledges that Dr. Helderman "[told] the jury how Dr. Blackshear's negligence injured [Ms. Haynes'] kidney function," testified that she "did not have any indications to support a workup for renovascular hypertension" and that the "renal vein renin assay results were meaningless," and thus, opined that "he didn't think there was a 'clinical indication' for the test." Ultimately he testified that he would not have ordered the renal vein renin assay or the angiogram or the balloon angioplasty. And although he couched his statements by describing what he would have done "as a nephrologist," Dr. Helderman still

9

testified to what <u>he</u>, <u>a nephrologist</u>, would have done (or, to use a finer point, what Dr. Blackshear should have done).

Because the determination of whether the decision to perform a procedure turns on what is "customary" in a given field, *Jackson*, 469 F. Supp. 2d at 1082, Dr. Helderman's testimony that he would not have ordered the testing Dr. Blackshear ordered was a direct comment on the "prevailing professional standard of care" for a health care provider engaged in Dr. Blackshear's specialty. *See* § 766.102(5)(a). There is no realm of relevancy in this medical negligence case against a vascular surgeon as to what a nephrologist would or would not have done if the roles were reversed. Therefore, because Dr. Helderman does not practice in the same specialty as Dr. Blackshear, the trial court erred in admitting his standard of care testimony. *See Clare*, 220 So. 3d at 1261-62; *Edwards v. Sunrise Ophthalmology ASC, LLC*, 134 So. 3d 1056, 1058-59 (Fla. 4th DCA 2013) (stating that an affidavit from an infectious disease doctor was insufficient to establish the standard of care for an ophthalmologist and could not be used to initiate a medical malpractice claim).

We next turn to the alleged unpled claim that Dr. Blackshear breached the standard of care by failing to refer Ms. Haynes to a nephrologist for evaluation of her hypertension and whether that issue was tried by consent. Foremost, we need not decide whether the alleged unpled claim was tried by consent. There is no merit to the argument that Blackshear waived any objection to this theory by failing to object during Dr. Helderman's testimony where the trial court granted Blackshear "a standing objection to anything that even hints of a standard of care." *See, e.g., Liberatore v. Kaufman*, 835 So. 2d 404, 407 n.3 (Fla. 4th DCA 2003) (stating that where plaintiffs raised a standing

10

objection to expert OB-GYNs' using a professional association bulletin "for any purpose other than impeachment" when the bulletin was first presented, the plaintiffs had properly preserved a challenge to the bulletin's later use to bolster the experts' testimony regarding the standard of care); *Derouin v. Universal Am. Mortg. Co.*, 254 So. 3d 595, 603 (Fla. 2d DCA 2018) (explaining that a valid objection prevents an issue from being tried by consent "[t]o the extent a contemporaneous objection is even necessary to prevent an unpleaded issue from being tried by consent").

Dr. Helderman's testimony from the standpoint of a nephrologist was mere smoke and mirrors and thus improperly encroached on the standard of care in a case against a vascular surgeon, running afoul of section 766.102(5). Accordingly, the trial court abused its discretion in allowing this testimony to be considered by the jury.

## III.

As the beneficiary of the error, Ms. Haynes "has the burden to prove that the error complained of did not contribute to the verdict." *Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1256 (Fla. 2014).

Ms. Haynes argues that any error in admitting Dr. Helderman's testimony was harmless where the jury also heard testimony from Dr. Harward on the standard of care for a vascular surgeon, citing *Barrio v. Wilson*, 779 So. 2d 413, 414-15 (Fla. 2d DCA 2000), in which this court stated that the erroneous admission of standard of care testimony from an expert of a different specialty was harmless where that testimony was cumulative of two other expert witnesses. In the context of the harmless error test, cumulative evidence means "evidence so repetitive that, notwithstanding its exclusion, it is not reasonably likely a different result would have occurred"; it does not mean "that an error in the admission of

11

evidence is harmless simply because there is additional admissible evidence in the record to support the ultimate result below." *Witham v. Sheehan Pipeline Constr. Co.*, 45 So. 3d 105, 109 (Fla. 1st DCA 2010). While Dr. Helderman also testified, as did Dr. Harward, that Dr. Blackshear deviated from the professional standard of care in ordering unnecessary tests, Ms. Haynes has not established that this duplicative testimony did not contribute to the verdict in a case where the necessity of the tests was central to the issues and experts on both sides disagreed whether the tests were medically necessary. *See, e.g., Linn v. Fossum*, 946 So. 2d 1032, 1041 (Fla. 2006) (holding that the erroneous admission of an expert's testimony that she had consulted other urologists to determine the appropriate standard of care "was not harmless because the competing expert opinions on the proper standard of care were the focal point of this medical malpractice trial").

## IV.

The trial court abused its discretion in allowing Dr. Helderman, a nephrologist, to testify on the standard of care for a vascular surgeon. Accordingly, we reverse the final judgment and remand for a new trial on counts one and four.

Reversed and remanded.

SILBERMAN and VILLANTI, JJ., Concur.

_____

Opinion subject to revision prior to official publication.